(No. 48997.-

RICHARD J. TALSKY, Appellee, v. THE DEPARTMENT
OF REGISTRATION AND EDUCATION *et al.*—(The
Department of Registration and Education, Appel-
lant.)

*Opinion filed Oct. 5, 1977.—Rehearing denied Nov. 23, 1977.*

580

CLARK and DOOLEY, JJ., dissenting.

William J. Scott, Attorney General, of Springfield (Charles J. Pesek, Assistant Attorney General, of Chicago, of counsel), for appellant.

Singer, Stein & Green, of Chicago, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Plaintiff, Richard J. Talsky, filed an action in the circuit court of Cook County for administrative review of an order issued by the defendant Ronald E. Stackler, Director of the Department of Registration and Education, suspending plaintiff's license to practice as a chiropractor for 90 days on the grounds that he had engaged in advertising to solicit professional business in violation of subsections 4 and 13 of section 16 of the Medical Practice Act (Ill. Rev. Stat. 1971, ch. 91, pars. 16a(4), 16a(13)). The suspension was stayed by the circuit court pending administrative review. On review, the circuit court reversed the Department's decision on the basis that the restrictions on advertising contained in section 16(13) of the Medical Practice Act were overly broad and impermissibly restricted freedom of speech in contravention of the first amendment to the United States Constitution. The Department appeals directly to this court pursuant to our Rule 302(a). 58 Ill. 2d R. 302(a).

At the conclusion of an administrative hearing before the Medical Examining Committee of the Department of Registration and Education, the plaintiff was found to have violated section 16(4) of the Medical Practice Act for "[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public" as well as section 16(13) of the Act, which prohibits advertising. It was the latter section which the circuit court held unconstitutional, and our review is accordingly limited to a consideration of that section, which provided for revocation or suspension of plaintiff's license on the following grounds:

"13. Except as otherwise provided in Section 16.01, advertising or soliciting, by himself or through another, by means of handbills, posters, circulars, steropticon

slides, motion pictures, radio, newspapers or in any other manner for professional business." Ill. Rev. Stat. 1971, ch. 91, par. 16a(13).

The exceptions to the advertising ban are described as follows in section 16.01:

"Any person licensed under this Act may list his name, title, office hours, address, telephone number and any specialty in professional and telephone directories; may announce, by way of a professional card not larger than 3½ inches by 2 inches, only his name, title, degree, office location, office hours, phone number, residence address and phone number and any specialty; may list his name, title, address and telephone number and any specialty in public print limited to the number of lines necessary to state that information; may announce his change of place of business, absence from, or return to business in the same manner; or may issue appointment cards to his patients, when the information thereon is limited to the time and place of appointment and that information permitted on the professional card. Listings in public print, in professional and telephone directories, or announcements of change of place of business, absence from, or return to business, may not be made in bold faced type." Ill. Rev. Stat. 1971, ch. 91, par. 16a—1.

The facts are not in substantial dispute. On August 30, 1972, plaintiff caused to be published in the "Berwyn Life" newspaper the one-half-page advertisement which is reproduced in appendix 1 to this opinion. Copies of the advertisement were also affixed to a substantial portion of the exterior window of the plaintiff's office in Cicero. As can be seen, the ads offered "FREE CHICKEN," "FREE REFRESHMENTS" and "FREE SPINAL X-RAY," and contained a section condemning reliance on drugs while extolling the virtues of the drugless chiropractic profession. On about August 13, 1974, plaintiff, individually or through another, attached advertising circulars similar to the ones reproduced in appendix 2 to certain traffic-light posts, a traffic-control box, and a United States mailbox located at the intersection of 57th Avenue and Cermak Road in Cicero, together with other circulars which

identified the location of the Talsky chiropractic offices in the Chicago area. These circulars remained at that location until the end of September 1974. Plaintiff also attached circulars of the same type to the exterior of his office window in Cicero in addition to business cards which would be torn off and removed by passersby. The cards contained the words "Chiropractic TLC Office," plaintiff's name, address and telephone number with the words "Talsky Life Center" and "Tender Loving Care" appearing in small hearts.

It is apparent that we are here concerned with the extent to which the State may exercise its police power to restrict advertising by members of the health-related professions without impermissibly infringing upon those members' first amendment rights to freedom of speech. In order to place the questions involved in this appeal in their proper context, it is appropriate to trace the development of these concepts in the decisions of the United States Supreme Court and this court.

In *Semler v. Oregon State Board of Dental Examiners* (1935), 294 U.S. 608, 79 L. Ed. 1086, 55 S. Ct. 570, the court considered a statute which prohibited dentists from advertising their professional superiority and their prices; from using certain types of advertising displays; from employing solicitors or publicity agents; and from advertising free dental work, free examinations, guaranteed work or painless dental operations. The question before the court was whether the restrictions were arbitrary and invalid under the due process clause of the fourteenth amendment. In upholding the validity of the regulation, the court stated:

> "The legislature was not dealing with traders in commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is

concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. \*\*\*

\*\*\* The legislature was entitled to consider the general effects of the practices which it described, and if these effects were injurious in facilitating unwarranted and misleading claims, to counteract them by a general rule even though in particular instances there might be no actual deception or misstatement." (294 U.S. 608, 612-13, 79 L. Ed. 1086, 1090, 55 S. Ct. 570, 572.)

The rationale of the *Semler* decision was adopted by this court in a number of cases upholding the right of the State to regulate advertising by those engaged in medical and related professions. (*E.g., Winberry v. Hallihan* (1935), 361 Ill. 121; *People v. Dubin* (1937), 367 Ill. 229; *Lasdon v. Hallihan* (1941), 377 Ill. 187; *Klein v. Department of Registration and Education* (1952), 412 Ill. 75; *People ex rel. Chicago Dental Society v. A.A.A. Dental Laboratories, Inc.* (1956), 8 Ill. 2d 330; *Cordak v. Reuben H. Donnelley Corp.* (1960), 20 Ill. 2d 153.) In *Lasdon,* it was observed: "In the exercise of police power the practice of the professions has been subjected to licensing and regulation for the reason that the services customarily rendered by those engaged in such professions are so closely related to the public health, welfare and general good of the people, that regulation is deemed necessary to protect such interests. It has been held a proper exercise of police power to legislate and protect the professions performing such services against commercialization and exploitation." (377 Ill. 187, 193.) In upholding the statute which prohibited advertising by those engaged in the business of making dental plates, we further stated in that case: "It is

well known that masses of the public do not comprehend or understand the skill that is necessary to the making of proper dentures and the proper charges to be made for such services. Such persons are often attracted by the advertisements of the quack and charletan and seek his services." 377 Ill. 187, 195.

The foregoing cases were decided primarily on due process grounds and were not concerned with first amendment questions. (But see *Cordak v. Reuben H. Donnelley Corp.* (1960), 20 Ill. 2d 153, 157.) This undoubtedly resulted from the fact that at the time those cases were decided the advertising of products and services was considered "purely commercial" speech which the United States Supreme Court had held was not entitled to first amendment protection. (*Valentine v. Chrestensen* (1942), 316 U.S. 52, 54, 86 L. Ed. 1262, 1265, 62 S. Ct. 920, 921.) The viability of the "commercial speech" exception to first amendment protection as enunciated in *Valentine* was seriously questioned by the court in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations* (1973), 413 U.S. 376, 37 L. Ed. 2d 669, 93 S. Ct. 2553, and was subsequently terminated in *Bigelow v. Virginia* (1975), 421 U.S. 809, 44 L. Ed. 2d 600, 95 S. Ct. 2222, *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817, and *Bates v. State Bar* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691. The latter two decisions, while not precisely on point, are highly significant in any consideration of the first amendment questions here.

In *Virginia Citizens,* the court struck down a Virginia statute which labelled it unprofessional conduct for a pharmacist to advertise prices of prescription drugs. No specific advertisement was at issue in the case, but the court hypothesized one reading as follows: "I will sell you the X prescription at the Y price." (425 U.S. 748, 762, 48 L. Ed. 2d 346, 358, 96 S. Ct. 1817, 1825.) The court first

unequivocally held that such pure commercial speech does have some first amendment protections. The court also noted that the adverse effect of the suppression of prescription drug price information was greatest upon the poor, the sick, and the aged, who must spend a disproportionate amount of their income on prescription drugs. "When drug prices vary as strikingly as they do, information as to who is charging what becomes more than a convenience. It could mean the alleviation of physical pain or the enjoyment of basic necessities." (425 U.S. 748, 763-64, 48 L. Ed. 2d 346, 360, 96 S. Ct. 1817, 1826-27.) The court was of the opinion that information as to who is producing and selling what product, for what reason, and at what price plays an important role in the preservation of a predominantly free-enterprise economy in which the allocation of resources is in large measure made through numerous private economic decisions. "It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable." (425 U.S. 748, 765, 48 L. Ed. 2d 346, 360, 96 S. Ct. 1817, 1827.) The court found the various justifications offered for the restrictions unconvincing, largely because high professional standards were already guaranteed to a substantial extent by the strict regulation to which pharmacists were subject in Virginia. The court further stated that "the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance. The advertising ban does not directly affect professional standards one way or the other. It affects them only through the reactions it is assumed people will have to the free flow of drug price information." (425 U.S. 748, 769, 48 L. Ed. 2d 346, 362-63, 96 S. Ct. 1817, 1829.) The court also suggested the following alternative to what it considered the "highly paternalistic approach" of the State: "That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests

if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." (425 U.S. 748, 770, 48 L. Ed. 2d 346, 363, 96 S. Ct. 1817, 1829.) *Virginia Citizens* clearly does not, however, mean that a State can never regulate commercial speech. The court said: "Some forms of commercial speech regulation are surely permissible. We mention a few [time, place, and manner restrictions; false, deceptive, or misleading speech; and speech which proposes an illegal transaction] only to make clear that they are not before us and therefore are not foreclosed by this case." 425 U.S. 748, 770, 48 L. Ed. 2d 346, 363, 96 S. Ct. 1817, 1830.

*Virginia Citizens* also left open the question whether advertisement of professional services was entitled to first amendment protection similar to that given to advertisement of retail prices of prepackaged prescription drugs. *Bates v. State Bar* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691, has quite recently answered this question affirmatively with respect to the advertisement of routine professional (legal) services. There, the court struck down a disciplinary rule of the Arizona Supreme Court prohibiting a lawyer from advertising. Two Arizona lawyers operating a legal clinic had advertised: "Do you need a lawyer? Legal services at very reasonable fees," and had specified fees for several routine uncontested matters.

In defining the issue before it, the court pointed out that no questions were raised relative to advertising the quality of legal services, nor was it concerned with problems associated with in-person solicitation of clients. Instead, the narrow question was whether lawyers could constitutionally advertise the prices at which certain "routine" services would be performed. Various arguments were proffered by the State bar in support of the restriction on price advertising, including an alleged adverse effect on professionalism, and contentions that

professional advertising by lawyers inevitably would be misleading, that advertising would have an adverse effect on the administration of justice as well as on the quality of services provided by the legal profession, and that a wholesale restriction on advertising by lawyers is justified by the enforcement problems which would result if any other course was taken. While these arguments were not considered sufficient to justify a ban upon all advertising, the court apparently considered them sufficient to warrant the narrow restriction or regulation of advertising which the opinion indicated would be permissible. The court stated: "The disciplinary rule at issue likely has served to burden access to legal services, particularly for the not-quite-poor and the unknowledgable. A rule allowing restrained advertising would be in accord with the bar's obligation to 'facilitate the process of intelligent selection of lawyers, and to assist in making legal services fully available.' ABA Code of Professional Responsibility EC 2–1 (1976)." (433 U.S. 350, 377, 53 L. Ed. 2d 810, 831, 97 S. Ct. 2691, 2705.) The court concluded that the publication in a newspaper of a truthful advertisement concerning the availability and prices of routine legal services was entitled to first amendment protection and that application of the disciplinary rule was violative of the first amendment. As it did in the *Virginia Citizens* case, however, the court emphasized that its holding did not mean that advertising by attorneys could not be regulated in any manner. The court again specifically stated that advertising which is false, deceptive or misleading is subject to restraint and pointed out that "the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena." (433 U.S. 350, 383, 53 L. Ed. 2d 810, 835, 97 S. Ct. 2691, 2709.) The court also re-iterated the view expressed earlier in the *Virginia Citizens* case that the State may impose reasonable restrictions on

the time, place and manner of advertising and could suppress advertising concerning illegal transactions.

It is entirely clear that the advertisements before us violate section 16(13). However, under the authority of *Virginia Citizens* and *Bates,* we must conclude that the restrictions therein are overly broad and may operate in some cases to suppress commercial speech in violation of the first amendment. We commend to the General Assembly the reconsideration of these restrictions in the light of current constitutional interpretations.

Ordinarily a litigant is permitted to bring first amendment overbreadth attacks against a statute without demonstrating that his particular conduct is protected. (*Gooding v. Wilson* (1972), 405 U.S. 518, 521-22, 31 L. Ed. 2d 408, 413-14, 92 S. Ct. 1103, 1105-06.) The rationale is to fully protect permissible speech which might otherwise be inhibited by an overbroad statute. But the Supreme Court in *Bates* ruled that this rationale is inapplicable to commercial speech such as in this case. "[I]t seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. *** Since overbreadth has been described by this Court as 'strong medicine,' which 'has been employed . . . sparingly and only as a last resort,' *Broadrick v. Oklahoma*, 413 U.S., at 613, we decline to apply it to professional advertising, a context where it is not necessary to further its intended objective." 433 U.S. 350, 381, 53 L. Ed. 2d 810, 834, 97 S. Ct. 2691, 2707-08. Accordingly, we must specifically examine plaintiff's advertisements to determine whether they are entitled to first amendment protection under the criteria set forth in *Virginia Citizens* and *Bates.*

There can be no question about the fact that advertising by those engaged in the profession of treating bodily ills involves different considerations and risks than are involved in advertising by others. The availability of

proper medical attention at the right time and from the right source obviously is of critical importance to every person. The natural and compelling urge to maintain good health and to find a cure for disease renders people particularly susceptible to advertising which suggests a means to accomplish these objectives. The potential to mislead is great, and it is apparent that the State has a very real and compelling interest in restricting the advertising of health-care services to those which are truthful, informative and helpful to the potential consumer in making an intelligent decision.

It is evident that Dr. Talsky's advertisements are significantly different from those in the *Virginia Citizens* and *Bates* cases, which were described by the Supreme Court as "restrained professional advertising." (See 433 U.S. 350, 372, 53 L. Ed. 2d 810, 828, 97 S. Ct. 2691, 2703.) We note in particular the portion of the newspaper ad (appendix 1) entitled "Do You Feel Like This Fellow Looks?" which asks the questions "Wouldn't you like to feel better? Think about this . . . If you feel as bad as you do now, how will you feel in 10, 20, 30 years from now? Can you afford to continue patching up symptoms when health is within reach through chiropractic. IT'S NOT TRUE TO SAY . . . 'We are doing everything possible' UNLESS CHIROPRACTIC IS INCLUDED." *"How about a CHIROPRACTIC spinal* 'BACK' TO SCHOOL CHECK-UP." The posted circulars and cards contained a before/after type set of pictures showing one healthy and one apparently sick, starving child and stating "SADNESS to SUNSHINE" and "SICKNESS to HEALTH"; the business cards play upon the letters TLC—"Talsky Life Center" and "Tender Loving Care"—both phrases being contained in little hearts. The advertisements assure the reader that "health is in reach through chiropractic" and "elimination of the NEED for drugs *** is not a far fetched idea, but an accomplished

fact!! The answer to most health problems is found in chiropractic—the world's largest and finest drugless healing profession. That's right: drugless. Chiropractic eliminates the need for drugs which treat symptoms by eliminating the true cause of most chronic health problems— displacement of spinal vertebrae." The advertisements offer free chicken and refreshments, identify with a well-known celebrity (the newspaper advertisement quotes Art Linkletter on drug abuse), and picture a man on his knees praying and asking, "Why didn't someone tell me about chiropractic care sooner" while relaying the message, "Others get well, so can you."

We include the foregoing lengthy recitation of plaintiff's advertisements and techniques to emphasize the differences between this case and the *Virginia Citizens/ Bates* tandem. Plaintiff does not advertise "X product or X service at Y price." Plaintiff's advertisements do not concern a uniform product or a routine standardized service, nor do they convey information which is susceptible of precise measurement or empirical testing in order to determine whether it is false, deceptive or misleading.

In *Bates,* citing *Virginia Citizens,* the court emphasized the importance of not restricting the dissemination of information which assures "informed and reliable decisionmaking" by the public. (433 U.S. 350, 364, 53 L. Ed. 2d 810, 823, 97 S. Ct. 2691, 2699.) The thinly veiled, alluring promises of physical relief contained in Dr. Talsky's advertisements clearly do not serve that function. Little, if any, information is given which would be helpful to intelligent decision making, and it cannot, in our judgment, fairly be said that prohibiting advertising of the type before us denies useful information to any segment of society as in *Virginia Citizens* or inhibits access to needed professional services as in *Bates.* This case simply does not involve "restrained professional advertising."

The potential for abuse in advertising by professionals, especially in the health-care field where persons are peculiarly susceptible to alluring promises of relief, has long been recognized. (See, *e.g., Semler v. Oregon State Board of Dental Examiners* (1935), 294 U.S. 608, 612, 79 L. Ed. 1086, 1090, 55 S. Ct. 570, 572; *Klein v. Department of Registration & Education* (1952), 412 Ill. 75, 83; *Lasdon v. Hallihan* (1941), 377 Ill. 187, 195.) The recent Supreme Court decisions do not require that our concern for such problems be discarded. On the contrary, *Bates* recognized the need for close regulation and tight restrictions on misleading and untruthful professional advertising, and its rationale is applicable here: "Thus, the leeway for untruthful or misleading expression that has been allowed in other contexts has little force in the commercial arena. [Citations.] In fact, because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising. For example, advertising claims as to the quality of services—a matter we do not address today—are not susceptible to measurement or verification; accordingly, such claims may be so likely to be misleading as to warrant restriction. Similar objections might justify restraints on in-person solicitation. We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of even an advertisement of the kind ruled upon today so as to assure that the consumer is not misled." (Footnote omitted.) 433 U.S. 350, 383-84, 53 L. Ed. 2d 810, 835-36, 97 S. Ct. 2691, 2709.

We emphasize that this opinion should not be construed as indicating our blanket approval of the statutory restrictions as applied to "restrained professional advertising" by those professionals subject to the Medical Practice Act.

Since, in our view, plaintiff's advertisements were uninformative and misleading, they were not entitled to first amendment protection within the purview of the *Virginia Citizens* and *Bates* decisions. We believe it is further evident that the attachment of even protected advertising material to traffic-light posts, traffic-control boxes and United States mailboxes would constitute an improper time, place and manner for the advertising of professional services under those cases. We therefore conclude that the trial court erred in holding section 16(13) of the Medical Practice Act unconstitutional and violative of plaintiff's first amendment right of freedom of speech with regard to the advertising here in question.

Plaintiff also argues that the statute must be held invalid since the terms "advertising" and "solicitation" are unconstitutionally vague and because review of the Department's decision under the Administrative Review Act does not provide a sufficiently prompt resolution of the matter. We find no merit to these contentions. Likewise, we do not agree with plaintiff's argument that he has been denied equal protection of the law by a statute which singles out medical practitioners for restrictions on advertising. The justification and necessity for regulation of those engaged in professions which are closely related to public health, welfare and the general good of the public are too well established to require discussion. *E.g., United States v. Oregon State Medical Society* (1952), 343 U.S. 326, 96 L. Ed. 978, 72 S. Ct. 690; *Semler v. Oregon State Board of Dental Examiners* (1935), 294 U.S. 608, 79 L. Ed. 1086, 55 S. Ct. 570; *Lasdon v. Hallihan* (1941), 377 Ill. 187.

The judgment of the circuit court of Cook County is reversed, and the order of the Department of Registration and Education suspending plaintiff's license for 90 days is affirmed.

*Judgment reversed; order affirmed.*

**DRUGS COST OVER $6,000,000,000**

Our national drug bill is now over six billion dollars—more than $30 for each man, woman and child in the country! As a nation we are becoming dependent upon "innocent-sounding" pills. Countless millions have created a "drug-curtain" between themselves and reality, little realizing that they are in fact becoming HOOKED on drugs!

"Relief is just an instant away," is the message Madison Avenue bombards us with night and day. Advertising strategy is as varied as the pills of every size, color, coating and speed of action.

The "youth problem" is only a small part of the national problem. Overweight housewives have become the miracles of pharmacology, it is hypnotically ingesting as much chemical as 'Gracious' physicians will prescribe."

The abuse of drugs by youth today is, frankly stated, the example set by parents! The first drugs most young people get are from the family medicine cabinet. "For kicks" they take their parents tranquilizers, diet or weight pills or drink cough syrup for the codine. Thus, the sins of the parents will recap a bitter harvest in the future.

**WHAT IS THE SOLUTION?**

What is the solution to this terrible problem? First, the nation must be aroused and fully awakened to the magnitude and scope of this problem and realize that it goes into every medicine cabinet in America. No testimonials and COME TO OUR OPEN HOUSE AND FIND OUT WHAT CHIROPRACTIC HAS TO OFFER FOR YOU AND YOUR ENTIRE FAMILY.

*How about a CHIROPRACTIC spinal* "BACK" TO SCHOOL CHECK-UP

HEALTH WITHIN YOUR REACH

# PREVENTICARE

FAMILY CHIROPRACTIC MAINTENANCE CARE

ALL THAT'S MISSING IS

# YOU

ADJUSTING ROOM WITH PATIENT HAVING SPINE CHECKED. (4 YEAR OLD TRACY)

EXAMINATION ROOM WITH PATIENT GETTING SPINAL X-RAY EXAM

ENTIRE FAMILIES WAITING TO HAVE THEIR SPINES CHECKED.

# WE LOVE CHIROPRACTIC

## FACIAL NEURALGIA

I visited doctor after doctor trying to get relief for a severe pain in the left side of my face called tri-geminal neuralgia. I was given injections of drugs including pain-killers and told if it didn't help I would have to submit to surgery to have the nerve severed.

This would leave me without any feeling in one half of my face; I would also drool and would have to be very careful not to bite into my tongue while eating.

I was referred to Dr. Talsky by a friend who was helped for a serious condition. After my second adjustment I was able to bite into an apple. The pain has disappeared with all my frustration and depression. I have nothing but praise for this profession after living the life of a "Guinea pig" and intend to continue with my adjustments.

Mrs. Anne Donat (Sunshine)
7117 W. Pershing Rd.
Berwyn, Illinois
788-9121

## BLADDER INFECTION

I bring my 9 year old daughter, Lisa, who had bladder infections quite often and her tonsils were very bad. The m.d. was giving her two bottles of penicillin to stop the infection. Since chiropractic care she's had only one short bladder infection (clearing in a fraction of the time) and no more problem with tonsils. She enjoys her regular visits.

LISA
Mrs. Sue Elliot
& Lisa
1436 S. 50th Ct.

**OUR MOTTO:**
Better Health at Lower Costs

# LIFE FOUNDATION
## MEMBER

## FREE CHICKEN
## FREE REFRESHMENTS
## FREE SPINAL X-RAY
### IN COOPERATION WITH THE
### LIFE FOUNDATION OF ATLANTA, GA.

# SUNDAY
# SEPT. 3RD
# 3 P.M.
## EVERYONE
## WELCOME

**Marking 2 Years At Our Location In Cicero**

# ANNOUNCING
## A
# CHIROPRACTIC
# OPEN HOUSE

5830 W. Cermak Rd., Cicero, ILLINOIS   60650
Telephone: (312) 656-0090

**DR. RICHARD TALSKY
CHIROPRACTOR**

**OR**

So we may know how much Chicken to order please call and tell us how many will be in your group.

## EVERYTHING YOU EVER WANTED TO KNOW ABOUT CHIROPRACTIC

### BUT DIDN'T KNOW WHO TO ASK

# HAVE WE BECOME A DRUG-SATED SOCIETY?

**DRUGS COST OVER $6,000,000,000     ADS AGGRAVATE THE PROBLEM**

Our society has become drug-sated. Never before have so many people taken so many different pills and potions for so many different reasons: pills for sleeping and pills for staying awake; pills to excite you and pills to calm you down; pills to lose weight and others to gain weight; pills for everything from birth to death.

One of the best-known crusaders against our modern drug craze is Art Linkletter, whose daughter was killed by an overdose of drugs. On a national TV program Art Linkletter said, "This was a natural course for my daughter and many other young people who sought a thrill from the use of drugs because our entire society has become drug-orientated. "Drug abuse cannot be connected with narcotics users only," according to Art Linkletter, "The alarming rise in the abuse of stimulant, depressant and hallucinogenic drugs cuts across all strata of society."

### OUR CULTURE IS DRUG-DEPENDENT

Our entire culture is truly becoming drug-dependent. Over 100,000,000 Americans—more than half the population use drugs ranging from tranquilizers to barbiturates and amphetamines, not counting marijuana or LSD. This grave national problem is far broader and deeper than merely "alarming fads among the youth."

Millions of ordinary, middle-aged, middle-income Americans gulp billions of tranquilizers—in fact, last year 5,000,000,000 tranquilizers were downed by over 50 million people, but

addicted to amphetamic "reducing pills." Some businessmen, who have tried pills to cure their hangovers, have become "hooked." Some "senior

**Do You Feel Like This Fellow Looks?**

You can't change the past and you don't know the future, you only have the present. Wouldn't 'you 'like to feel better? Think about this - - - If you feel as bad as you do now, how will you feel in 10, 20, 30 years from now?

Can you afford to continue patching up symptoms when health is within reach through chiropractic.

IT'S NOT TRUE TO SAY - - - "We are doing everything possible" UNLESS CHIROPRACTIC IS INCLUDED

citizens" take pills because of their fear of old-age. Many become "hooked" and don't even realize it!

### ADS AGGRAVATE THE PROBLEM

What is the cause of our national drug problem? Certainly psychologically planned advertising, taking advantage of television and other mass media of modern mass media of communication; contributes greatly to the problem as it plays on the pressures and problems of modern life. In Martin Gross' powerful, documented book The Doctors he explains, "America is currently involved in a massive, promiscuous addiction to the concept of medication. Having oversold itself on

problem can be solved until everyone involved realizes the problem!

The ideal solution—simple to state but nearly impossible to implement—would be to abolish the use of all drugs except under very tightly-regulated conditions! A step in this direction would be the banning of advertising—first on television and then in other media—of all drug advertising.

To implement even this first step requires an informed and aroused citizenry. We're helping to alert the public through articles such as this one, and you can help us by showing this to your friends and relatives.

### ELIMINATE NEED FOR DRUGS

Even more important than elimination drug advertising is the elimination of the NEED for drugs! This is not a far fetched idea, but an accomplished fact!! The answer to most health problems is found in chiropractic—the world's largest and finest drugless healing profession. That's right: drugless. Chiropractic eliminates the need for drugs which treat symptoms by eliminating the true cause of most chronic health problems—displacement of spinal vertebrae.

The nerve energy which powers every organ of the body and is necessary for cell life flows through the spinal cord and the nerves. When a vertebrae moves out of its normal range of motion and becomes fixed by changes in the ligaments and muscles, the nerve power for various organs is cut off and sickness results. If you are not personally acquainted with chiropractic, read carefully all the true

**FAMILY
CHIROPRACTIC
LIFE CENTER**

CHIROPRACTIC
**TLC**
OFFICES OF
GREATER CHICAGO

Home Office 832-9300
ELMHURST 627 N York Rd
Karen Talsky C A

656-0090
CICERO 2206 S 57th Ave
Helen Beyer C A

871-1700
CHICAGO 2034 N Clark St
Gloria Talsky C A

Talsky Life Centers · Tender Loving Care

DR R TALSKY, CHIROPRACTOR
health maintenance for the *entire* family

ATTENTION NEIGHBORS

The TALSKY CHIROPRACTIC LIFE CENTER on Clark St., is seeking an
active individual who would like to work, part time. An ideal
situation for an individual who is available Monday through Sat.,
during the day. Attractive and interesting working conditions.
If interested please apply or call 871-1700

MR. JUSTICE CLARK, dissenting:

I would uphold the judgment of the circuit court.

To determine the constitutionality of a given restriction of first amendment rights, the court must weigh the State's interest in the restriction against the policies underlying the first amendment generally, and against the rights of the speaker and his audience particularly. (See, e.g., *Virginia State Board of Pharmacy v. Virginia Citizens Control Council* (1976), 425 U.S. 748, 756-70, 48 L. Ed. 2d 346, 355-63, 96 S. Ct. 1817, 1822-30.) Here the State's purported interest is in protecting its citizens from being misled by advertisements falsely claiming exorbitant benefits from chiropractic services. I believe the majority seriously underestimates the intelligence, common sense, and good judgment of the people of this State. Consequently, the majority has vastly overestimated the State's interest in restricting the plaintiff's right to speak and the people's right to hear him.

The majority concedes that the statute is grossly overbroad, yet it still finds plaintiff's conduct punishable. (See 68 Ill. 2d at 590-92.) The majority does not, however, adequately delineate what it finds objectionable in the plaintiff's advertisements. Is it the free chicken? The suggestion that drugs are not the answer to all problems? The statements of satisfied former patients?

The Department does not contend that plaintiff promised anything that he could not deliver, nor does it contend that plaintiff was proposing to do anything unlawful or otherwise harmful. In the absence of such a showing, I would let the people of this State make up their own minds about the value of chiropractic services, rather than have the Department do it for them. I therefore respectfully dissent.

MR. JUSTICE DOOLEY, also dissenting:

The majority commingles and confuses section 16(4)

of the Medical Practice Act relating to ethical conduct and section 16(13) prohibiting advertising by all licensees (Ill. Rev. Stat. 1971, ch. 91, pars. 16a(4), 16a(13)).

Section 16(13) prohibits, "[e]xcept as otherwise provided in Section 16.01, advertising or soliciting, by himself or through another, by means of handbills, posters, circulars, stereopticon slides, motion pictures, radio, newspapers or in any other manner for professional business." Ill. Rev. Stat. 1971, ch. 91, par. 16a(13).

The statute exempts from the ban, by reference to another section of the Act, listing in telephone or professional directories and the issuance of professional cards of prescribed dimensions with contents limited to name, title, address, phone, degrees and specialty. Ill. Rev. Stat. 1971, ch. 91, par. 16a—1.

The root cause of this controversy is the constitutionality of the prohibition against all advertising. In holding this statute constitutional the majority opinion goes directly counter to the recent decisions of the United States Supreme Court defining first amendment rights. In so doing, it is out of touch with today's trend of the law.

I take no issue with the majority review of early cases determining that the due process clause was not infringed by imposing regulations on those engaged in the medical profession. (*Semler v. Oregon State Board of Dental Examiners* (1935), 294 U.S. 608, 79 L. Ed. 1086, 55 S. Ct. 570.) My concern—and it is a grave one—is with our duty under the fourteenth amendment to protect first amendment rights as interpreted by the United States Supreme Court (*Bigelow v. Virginia* (1975), 421 U.S. 809, 811, 44 L. Ed. 2d 600, 606, 95 S. Ct. 2222, 2227), and to determine whether section 16(13) of the Medical Practice Act infringed such rights.

Some 25 years ago the United States Supreme Court in *Valentine v. Chrestensen* (1942), 316 U.S. 52, 54, 86 L. Ed. 1262, 1265, 62 S. Ct. 920, 921, in considering a

municipal sanitary ordinance prohibiting the distribution of advertising handbills on streets, limited first amendment protection of "commercial speech." But what constituted "commercial speech" was not defined. In the quarter century since *Chrestensen* the United States Supreme Court has retreated from that position and finally rejected any such all-pervasive lack of protection. *Bigelow v. Virginia* (1975), 421 U.S. 809, 818, 44 L. Ed. 2d 600, 609, 95 S. Ct. 2222, 2230-31.

Although courts have consistently held that a prohibition of deceptive advertising does not offend the first amendment (*Donaldson v. Read Magazine, Inc.* (1948), 333 U.S. 178, 189, 92 L. Ed. 628, 640, 68 S. Ct. 591, 597), it is well established that advertising is a medium of information and persuasion providing much of the day-to-day education of the American public and facilitating allocation of resources necessary to a free-enterprise economy. (*Bates v. State Bar* (1977), 433 U.S. 350, 364, 53 L. Ed. 2d 810, 823, 97 S. Ct. 2691, 2699; *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 765, 48 L. Ed. 2d 346, 360, 96 S. Ct. 1817, 1827; *Bigelow v. Virginia* (1975), 421 U.S. 809, 821, 44 L. Ed. 2d 600, 612, 95 S. Ct. 2222, 2232; *Developments in the Law—Deceptive Advertising*, 80 Harv. L. Rev. 1005, 1027 (1967).) It is, therefore, entitled to first amendment protection. See also *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations* (1973), 413 U.S. 376, 37 L. Ed. 2d 669, 93 S. Ct. 2553; *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 270, 11 L. Ed. 2d 686, 701, 84 S. Ct. 710, 721; *NAACP v. Button* (1963), 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328; Note, *Commercial Speech—An End in Sight to Chrestensen?*, 23 DePaul L. Rev. 1258, 1269 (1974); Note, *Advertising, Solicitation and the Professions's Duty to Make Legal Counsel Available*, 81 Yale L.J. 1181, 1186 (1972).

In *Pittsburgh Press Co. v. Pittsburgh Com. on Human Relations* (1973), 413 U.S. 376, 37 L. Ed. 2d 669, 93 S. Ct. 2553, in which discriminatory advertisement was not entitled to first amendment protection, the court indicated that in some situations commercial advertising may serve first amendment interests and prevail when balanced against governmental interest in regulation. In the ensuing years in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817, and in *Bates v. State Bar* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691, the United States Supreme Court unequivocally held that advertising was entitled to first amendment protection. Here, the majority undercuts the thrust of *Virginia Pharmacy* and *Bates.*

In *Virginia Pharmacy* the United States Supreme Court invoked the balancing approach. While acknowledging that the State had a strong interest in maintaining professionalism among pharmacists (just as the State has an interest in maintaining professionalism among chiropractors), the court held that a statute banning all advertising of price lists violated first amendment rights. It stated:

> "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." (425 U.S. 748, 770, 48 L. Ed. 2d 346, 363, 96 S. Ct. 1817, 1829.)

Although the court indicated that regulation of certain kinds of speech would be permissible, *i.e.,* time, place and manner restrictions, and false, deceptive or misleading speech, it recognized that such a permissible regulation was not before it. First amendment rights were violated.

It is that determinative factor in *Virginia Pharmacy* which the majority here overlooks. Although some type of

commercial-speech regulation could be deemed constitutional, such a permissible regulation was not before it. As a result, the Supreme Court held the regulation unconstitutional in violation of first amendment rights. Here, too, we have no such permissible regulation or statute which could, under *Virginia Pharmacy,* be constitutional.

On the contrary, section 16(13) of the Medical Practice Act does not merely restrict false, deceptive or misleading speech, or limit the time, place and manner of advertising. It prohibits all advertising and soliciting in all known modes or "in any other manner." (Ill. Rev. Stat. 1971, ch. 91, par. 16a(13).) Under the *Virginia Pharmacy* case this court is obliged to consider the statute before it, not what it might be, in determining whether first amendment rights are involved. What might have been can never be known—even to a court.

Most recently, in *Bates v. State Bar* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691, the Supreme Court condemned as violative of first amendment rights a comprehensive ban on all advertising by members of the legal profession. The court stated: "In sum, we are not persuaded that any of the proffered justifications rise to the level of an acceptable reason for the *suppression of all advertising by attorneys.*" (Emphasis added.) (433 U.S. 350, 379, 53 L. Ed. 2d 810, 833, 97 S. Ct. 2691, 2707.) While advertising by attorneys may not be subjected to blanket suppression, it was recognized that "there may be reasonable restrictions on the time, place and manner of advertising" (433 U.S. 350, 384, 53 L. Ed. 2d 810, 836, 97 S. Ct. 2691, 2709). In *Bates* the statute before the Supreme Court had no such "reasonable restrictions" on advertising and therefore infringed first amendment rights. The same may be said of the statute before us today.

I cannot perceive how the majority opinion can so strain the language in *Virginia Pharmacy* and *Bates* to sustain its position that section 16(13), a blanket suppres-

sion of advertising, is constitutional. The majority, we assume, is aware that we are not considering permissible "reasonable restrictions" on advertising. The particular statute imposes a comprehensive ban on all advertising.

The majority concedes that, under *Bates*, section 16(13) may be "overly broad." It admits that "it may operate in some cases to suppress commercial speech in violation of the first amendment," and even goes further to suggest that the General Assembly reconsider the statute "in the light of current constitutional interpretations." But then it draws away from the vortex. In the exercise of a splendid optimism, it construes section 16(13) as though it were rewritten by the court and permitted "restrained professional advertising," and barred only false, deceptive or misleading advertising, and, therefore, finds it constitutional. Does the majority actually hold that section 16(13), barring all advertising by those subject to the Medical Practice Act, does not mean what it says? Just what are the terms of this apparently "rewritten" statute? How can such terms be applied by any court?

We are obliged to adjudicate the constitutionality of section 16(13) as it is written, not as it might be rewritten by this court to conform to language in the United States Supreme Court cases. In my opinion it is an improper exercise of a judicial function to rewrite this statute banning all advertising to mean that it prohibits only misleading advertising. In so doing, we abdicate a fundamental function of the third branch of government, to determine the constitutional character of the legislative product. More than that, we usurp the legislative function in, in effect, rewriting a statute.

The judgment of the circuit court voiding section 16(13) of the Medical Practice Act as unconstitutional ought to be affirmed.