(No. 78422.—Reversed and remanded.)

JAMES H. DESNICK, M.D., Appellee, v. THE DE-PARTMENT OF PROFESSIONAL REGULA-TION *et al.*, Appellants.

*Opinion filed April 18, 1996.—Rehearing denied June 3, 1996.*

McMORROW, J., dissenting.
McMORROW, J., dissenting on denial of rehearing.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Brian F. Barov, Assistant Attorney General, of Chicago, of counsel), for appellants.

Dan K. Webb, Steven F. Molo, Julie A. Bauer and

Stephen V. D'Amore, of Winston & Strawn, of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

This case concerns whether section 22(A)(24) of the Illinois Medical Practice Act of 1987 (Ill. Rev. Stat. 1991, ch. 111, par. 4400—1 *et seq.*) may be constitutionally applied to regulate commercial speech by plaintiff (U.S. Const., amends. I, XIV; Ill. Const. 1970, art. I, § 4), and whether the provision is also unconstitutionally vague on its face (U.S. Const., amends. I, XIV; Ill. Const. 1970, art. I, § 2). We conclude that, contrary to the circuit court's finding below supporting the grant of a temporary restraining order, application of the provision to regulate plaintiff's speech in these circumstances is constitutional, and that the provision is not vague on its face. For reasons which follow, we reverse the judgment of the circuit court of Cook County, granting the plaintiff, James H. Desnick, M.D., a temporary restraining order on the basis of the invalidity of section 22(A)(24), and remand for further proceedings.

Background

In 1992, defendants, the Illinois Department of Professional Regulation (Department) and its director, Nikki M. Zollar, commenced disciplinary proceedings against plaintiff, Dr. James H. Desnick, an ophthalmologist licensed to practice medicine in Illinois. The multicount disciplinary complaint sought the suspension or revocation of Dr. Desnick's license or other disciplinary action on several grounds, including the alleged violation of section 22(A)(24) of the Medical Practice Act (Act). Section 22(A)(24) provides:

"The Department may revoke, suspend, place on probationary status, or take any other disciplinary acts as the Department may deem proper with regard to the

license or visiting professor permit of any person issued under this Act to practice medicine, or to treat human ailments without the use of drugs and without operative surgery upon any of the following grounds:

* * *

Solicitation of professional patronage by any corporation, agents or persons, or profiting from those representing themselves to be agents of the licensee." Ill. Rev. Stat. 1991, ch. 111, par. 4400—22(A)(24).

According to the pleadings, Desnick violated this provision by utilizing a telemarketing firm to telephone persons aged 65 years and over and offer them a free eye examination appointment and free transportation to the Desnick Eye Center. These services were offered provided the persons answered the telemarketer's scripted questions, indicating they had not previously visited the Desnick Eye Center; did not belong to a health maintenance organization (HMO); did not have a personal ophthalmologist, but were insured under Medicare. (See Appendix.)

Shortly thereafter, Desnick filed this action in the circuit court of Cook County, requesting declaratory judgment and permanent injunctive relief. The action challenged section 22(A)(24) on grounds that the provision was unconstitutionally vague and overbroad and also violated free speech under the federal and state constitutions. Desnick immediately moved for both a preliminary injunction and a temporary restraining order to prohibit defendants from enforcing section 22(A)(24), pending a determination on the merits. In December 1992, the circuit court entered a temporary restraining order enjoining defendants from effectively enforcing section 22(A)(24) against Desnick.

In May 1993, defendants filed their first-amended complaint in the disciplinary proceedings, which realleged in count XVI that Desnick had violated section 22(A)(24).

In October 1994, Desnick sought leave to file an amended complaint because defendants reasserted a violation of section 22(A)(24) in their first-amended disciplinary complaint. Desnick's amended complaint requested that section 22(A)(24) be declared unconstitutional and defendants be permanently enjoined from enforcing the provision. Desnick also moved on that same day for a preliminary injunction to enjoin defendants from enforcing section 22(A)(24) against him, pending a resolution of the case on the merits. On December 7, 1994, Desnick was granted leave to and did immediately file his amended complaint. On December 13, 1994, defendants moved to dismiss the amended complaint for lack of subject matter jurisdiction based on sovereign immunity.

On December 22, 1994, following a hearing, the circuit court found that Desnick satisfied the requirements for a preliminary injunction. The court found, *inter alia*, that it was reasonably likely that Desnick would succeed on the merits of his complaint because he had demonstrated that section 22(A)(24) violates the free speech provisions of the federal and state constitutions and was void for vagueness in violation of both constitutions' due process provisions. The trial court granted Desnick's motion for a preliminary injunction and enjoined defendants from prosecuting count XVI, "pending a determination of the merits of [the] action." In that order, also, the court denied defendants' motion to dismiss the complaint.

On January 5, 1995, defendants filed a notice of appeal to this court, pursuant to Supreme Court Rule 302(a), seeking reversal of the circuit court's December 22, 1994, order, denying their motion to dismiss, and a finding that section 22(A)(24) of the Act is constitutional as applied to Desnick's conduct. 134 Ill. 2d R. 302(a).

### Jurisdiction

Preliminarily, we consider our jurisdiction to review

this matter. Supreme Court Rule 302(a)(1) allows for direct appeals to this court from final judgments of the circuit court in cases where a state statute is held invalid. See 134 Ill. 2d R. 302(a)(1). Clearly, in this case, the circuit court effectively ruled that section 22(A)(24) was unconstitutional. The circuit court granted the preliminary injunction based on, *inter alia*, the finding that Desnick was likely to prevail on the merits of his complaint because he had shown section 22(A)(24) to be unconstitutional. *Cf. Sommer v. Village of Glenview*, 79 Ill. 2d 383 (1980) (interpreting trial court's statements and order as holding state statute unconstitutional); *Garcia v. Tully*, 72 Ill. 2d 1, 7 (1978) (trial court opinion and order found to apparently rest on finding state statute unconstitutional). An order granting a preliminary injunction, however, is an interlocutory order, which is normally appealable as a matter of right to the appellate court under Supreme Court Rule 307. See 134 Ill. 2d R. 307.

Nevertheless, this court has jurisdiction to permit a direct appeal from other than final judgments. See *Garcia*, 72 Ill. 2d at 7; 134 Ill. 2d R. 302(b) (permitting appeal to be taken directly to supreme court in cases where the public interest requires expeditious determination). Further, where the order appealed from rests on a finding of a statute's unconstitutionality, this court has assumed jurisdiction under Rule 302(a), notwithstanding the finality requirement. *Garcia*, 72 Ill. 2d 1. Consequently, we will review the matter.

## Standard of Review

A party seeking a preliminary injunction must establish, *inter alia*, that he is likely to succeed on the merits. The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court, and a reviewing court will not disturb the decision absent a clear abuse of that discretion. See *Chicago Health Clubs, Inc. v. Picur*, 124 Ill. 2d 1, 7-8 (1988).

First Amendment Challenge

Defendants first contend that the trial court erred by relying on the overbreadth doctrine, applicable to core first amendment speech, rather than relying on the framework set out in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980), that applies to commercial speech. Defendants secondarily contend that, under the *Central Hudson* framework, section 22(A)(24) may be constitutionally applied to prohibit Desnick's elderly Medicare recipient-targeted telephone solicitation, offering a free eye exam appointment and transportation to his clinic, because: (1) that solicitation does not constitute protected speech under the first amendment, and even if that solicitation is protected, section 22(A)(24) is (2) supported by the State's substantial interests in regulating the medical profession, in preventing overreaching by physicians, and in protecting its citizens' right to privacy; (3) directly and materially advances those interests; and (4) "narrowly drawn." See *Central Hudson Gas*, 447 U.S. at 565-66, 65 L. Ed. 2d at 350-51, 100 S. Ct. at 2351 (referring to a four-part analysis).

Desnick contends his solicitation constitutes protected speech under the first amendment and that section 22(A)(24) may not be constitutionally applied to prohibit his solicitation because the restriction does not satisfy the three remaining prongs of the *Central Hudson Gas* test. Desnick also maintains that the trial court did not actually rely on the overbreadth doctrine, although he argued it.

Commercial speech consists of "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas*, 447 U.S. at 561, 65 L. Ed. 2d at 348, 100 S. Ct. at 2349. Prior to the mid-1970s, the Supreme Court took the position that the first amendment did not protect commercial speech. See

*Valentine v. Chrestensen*, 316 U.S. 52, 54, 86 L. Ed. 1262, 1265, 62 S. Ct. 920, 921 (1942).

In 1976, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817 (1976), the Court changed course, invalidating a state statute barring pharmacists from advertising prescription drug prices. The Court found that purely commercial speech is entitled to first amendment protection from unwarranted governmental regulation. *Virginia State Board of Pharmacy*, 425 U.S. at 761-62, 48 L. Ed. 2d at 358-59, 96 S. Ct. at 1825-26. The Court expressed the belief that the free flow of commercial information is indispensable to the proper allocation of resources in a free enterprise system because it informs the numerous private decisions that drive the system. *Virginia State Board of Pharmacy*, 425 U.S. at 765, 48 L. Ed. 2d at 360, 96 S. Ct. at 1827.

Recently, the Court expressed its view that solicitation, unlike other forms of commercial expression, allows for direct and spontaneous communication between buyer and seller and also "enables the seller to direct his proposals toward those consumers whom he has a reason to believe would be most interested in what he has to sell. For the buyer, [solicitation] provides an opportunity to explore in detail the way in which a particular product or service compares to its alternatives in the market." *Edenfield v. Fane*, 507 U.S. 761, 766, 123 L. Ed. 2d 543, 552, 113 S. Ct. 1792, 1798 (1993).

Nevertheless, commercial speech remains subject to state regulation because of the nature of such speech. See *Virginia State Board of Pharmacy*, 425 U.S. at 771 n.24, 48 L. Ed. 2d at 364 n.24, 96 S. Ct. at 1830 n.24. Regulation of commercial speech is permissible by means of appropriate time, place, and manner restrictions and where such speech is false or misleading, or related to unlawful activity. *Virginia State Board of*

*Pharmacy*, 425 U.S. at 771–72, 48 L. Ed. 2d at 363–65, 96 S. Ct. at 1830–31.

The Court continues to carefully draw a common-sense distinction between speech proposing a commercial transaction, an area traditionally subject to government regulation, and other varieties of speech. See *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 622-23, 132 L. Ed. 2d 541, 549, 115 S. Ct. 2371, 2375 (1995); *Central Hudson Gas*, 447 U.S. at 562, 65 L. Ed. 2d at 348, 100 S. Ct. at 2349; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56, 56 L. Ed. 2d 444, 453, 98 S. Ct. 1912, 1918 (1978); *Bates v. State Bar*, 433 U.S. 350, 381, 53 L. Ed. 2d 810, 834, 97 S. Ct. 2691, 2707 (1977). " ' "Commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values," and is subject to "modes of regulation that might be impermissible in the realm of noncommercial expression." ' " *Florida Bar*, 515 U.S. at 623, 132 L. Ed. 2d at 549, 115 S. Ct. at 2375, quoting *Board of Trustees of the State University of New York*, 492 U.S. at 477, 106 L. Ed. 2d at 402, 109 S. Ct. at 3033, quoting *Ohralik*, 436 U.S. at 456, 56 L. Ed. 2d at 453, 98 S. Ct. at 1918; see also *Scott v. Ass'n for Childbirth at Home, International*, 88 Ill. 2d 279, 287 (1981). The Court takes the position that a parity of constitutional protections for commercial and noncommercial speech could dilute the force of the first amendment's guarantee with respect to noncommercial speech. *Florida Bar*, 515 U.S. at 623, 132 L. Ed. 2d at 549, 115 S. Ct. at 2375. Notably, the Court refrains from approaching a constitutional challenge to commercial speech in the same manner as noncommercial speech.

The Court has made clear that the overbreadth doctrine, traditionally utilized in analyzing challenges to a regulation's constitutionality, does not apply to commercial speech challenges. In analyzing challenges to a

regulation's constitutionality, the Court differentiates between an as-applied challenge, asserting that the regulation is not narrowly drawn, and an overbreadth challenge. A person making an as-applied challenge claims that the acts of his that are the subject of the litigation fall outside what a properly drawn regulation could cover. In contrast, a person making an overbreadth challenge attacks the regulation's validity, facially, claiming that it infringes protected speech even if it might constitutionally be applied to him. See *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 482-83, 106 L. Ed. 2d 388, 405, 109 S. Ct. 3028, 3036 (1989). The overbreadth doctrine was designed as a departure from traditional rules of standing, enabling persons who are themselves unharmed by a statute to challenge it facially on the ground that it may be applied unconstitutionally to others in situations not before the court. *Board of Trustees of the State University of New York*, 492 U.S. at 484, 106 L. Ed. 2d at 406, 109 S. Ct. at 3037. The doctrine derives from the recognition that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review. *Central Hudson Gas*, 447 U.S. at 565 n.8, 65 L. Ed. 2d at 350 n.8, 100 S. Ct. at 2351 n.8. In contrast, any party challenging the constitutionality of a restriction on commercial speech must necessarily demonstrate his standing by first showing that his particular conduct is protected under the first amendment.

The overbreadth doctrine is not applied by the Court to commercial speech because such expression is considered less likely to be and is therefore not easily deterred by overbroad regulation. See *Central Hudson Gas*, 447 U.S. at 565 n.8, 65 L. Ed. 2d at 350 n.8, 100 S. Ct. at 2351 n.8. Commercial speech will not be facially invalidated on grounds of overbreadth because com-

mercial speech is considered "more hardy, less likely to be 'chilled,' and not in need of surrogate litigators." *Board of Trustees of the State University of New York,* 492 U.S. at 481, 106 L. Ed. 2d at 404, 109 S. Ct. at 3035.

Based on concerns recognizing the distinction between commercial and noncommercial speech, the Court engages in an "intermediate scrutiny" of restrictions on commercial speech. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation. *Central Hudson Gas,* 447 U.S. at 563, 65 L. Ed. 2d at 349, 100 S. Ct. at 2350. A challenge to application of a commercial speech restriction is analyzed under the four-part framework set out in *Central Hudson Gas.* See *Florida Bar,* 515 U.S. at 622, 132 L. Ed. 2d at 549, 115 S. Ct. at 2375. Under *Central Hudson Gas,* it must first be determined whether the commercial speech at issue is protected speech under the first amendment, that is, the expression concerns lawful activity and is not misleading. If so, the commercial speech may be regulated, nonetheless, provided: the government asserts a substantial interest in support of its regulation; the regulation is shown to directly and materially advance that interest; and there exists a reasonable "fit" between the government's ends and the means chosen to accomplish those ends. See *Florida Bar,* 515 U.S. at 623-24, 132 L. Ed. 2d at 549, 115 S. Ct. at 2375-76; *Central Hudson Gas,* 447 U.S. at 564-65, 65 L. Ed. 2d at 350, 100 S. Ct. at 2350. The government bears the burden of justifying its restriction. See *Edenfield,* 507 U.S. at 770-71, 123 L. Ed. 2d at 555, 113 S. Ct. at 1800; *Zauderer v. Office of Disciplinary Counsel of the Supreme Court,* 471 U.S. 626, 647, 85 L. Ed. 2d 652, 670, 105 S. Ct. 2265, 2280 (1985).

The parties apparently accept without dispute that the targeted telephone solicitation at issue here is com-

mercial speech. Thus, because the overbreadth doctrine is not applicable to this area, we must determine initially whether Desnick's particular solicitation constitutes protected speech under the first amendment.

Defendants point out that the solicitation targets elderly Medicare recipients who are not members of an HMO or currently under the care of an ophthalmologist. Defendants claim that these persons are then offered a seemingly "something for nothing" proposition, a free eye exam and free transportation to and from Desnick's clinic. Defendants maintain that Desnick's purpose is not to create a long-lasting doctor-patient relationship for medical care. Rather, his purpose is to induce persons into his clinics where they can be persuaded to undergo eye surgery, the high profit earner for ophthalmologists. Defendants maintain that once in the clinic, with a display of superior medical knowledge, it is a relatively easy matter to influence these prospective patients to have surgery no matter how unnecessary or risky. The surgery also can be readily sold as "free" to the prospective patients because it would be billed to Medicare.

Defendants argue that such solicitation is not protected, as it is not conducive to informed and reliable decisionmaking by the recipient, and it fosters the potential for harmful medical abuse and overreaching which is manifest. Moreover, defendants claim Desnick's solicitation encourages the subordination of a physician's medical judgment to pecuniary gain, which is medically unethical and debases the profession.

Desnick maintains that his representatives' telephone solicitation is conducive to informed decisionmaking because the recipients need only terminate the telephone call and they have the option to decide whether they will keep any scheduled appointment they make at Desnick's Clinic. Desnick asserts that the provi-

sion of ophthalmic services is lawful activity and was not alleged by defendants to be misleading. Desnick asserts that his representatives merely provide information about his clinic's ophthalmic services.

Because the first amendment's concern for commercial speech is based on the "informational function of advertising," the government may legitimately suppress commercial expression that is more likely to deceive the public than inform it, or that relates to illegal activity. See *Central Hudson Gas*, 447 U.S. at 563, 65 L. Ed. 2d at 349, 100 S. Ct. at 2350; see also *Scott v. Ass'n for Childbirth at Home, International*, 88 Ill. 2d 279, 287 (1981). "Untruthful speech, commercial or otherwise, has never been protected for its own sake." *Virginia State Board of Pharmacy*, 425 U.S. at 771-72, 48 L. Ed. 2d at 364-65, 96 S. Ct. at 1830-31. And, while truthful advertising related to lawful activities is protected under the first amendment, where the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the states may impose appropriate restrictions. See *In re R.M.J.*, 455 U.S. 191, 203, 71 L. Ed. 2d 64, 74, 102 S. Ct. 929, 937 (1982). There can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than inform it. *Bates v. State Bar*, 433 U.S. 350, 383, 53 L. Ed. 2d 810, 835, 97 S. Ct. 2691, 2709 (1977).

Advertising by the professions poses special risks of deception. *Bates*, 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691; *In re R.M.J.*, 455 U.S. at 200, 71 L. Ed. 2d at 72, 102 S. Ct. at 936. "Physicians and lawyers *** do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the

consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." (Emphasis in original.) *Virginia State Board of Pharmacy*, 425 U.S. at 773 n.25, 48 L. Ed. 2d at 365 n.25, 96 S. Ct. at 1831 n.25.

Illinois cases are instructive in the area of first amendment entitlement. In *Talsky v. Department of Registration & Education*, 68 Ill. 2d 579 (1977), the Department of Registration and Education suspended a chiropractor's license to practice on grounds that he advertised to solicit professional business in violation of section 16(13) of the Medical Practice Act. The chiropractor challenged the constitutionality of section 16(13). His ads included statements that "health is in reach through chiropractic" and "elimination of the NEED for drugs *** is not a farfetched idea, but undisputed fact!!" The ads offered free chicken and refreshments and advanced other promotional statements.

The *Talsky* court examined authority expressing, and concurred with the view, that because the public is particularly susceptible to advertising or promises of medical relief, there exists a potential for abuse which the State has a compelling interest to guard against. *Talsky*, 68 Ill. 2d at 584-85. As compared to advertisements found to be "restrained professional advertising," the court found the chiropractor's advertisements uninformative, misleading, and therefore not entitled to first amendment protection. *Talsky*, 68 Ill. 2d at 591. *Talsky* essentially found that the chiropractor's ads did not constitute protected speech.

Likewise, in *Ardt v. Illinois Department of Professional Regulation*, 154 Ill. 2d 138 (1992), the Department of Professional Regulation disciplined a dentist on grounds that he violated professional advertising provisions under the Illinois Dental Practice Act prohibiting

claims of superior quality care and pain-free treatment. The dentist responded that the provisions contravened his first amendment right to free speech. The dentist's ads represented, in part, that he provided "quality dentistry" and that "total comfort" was available with anesthesia and analgesics. The *Ardt* court found these terms implied superior quality and a pain-free experience and were, thus, inherently misleading and could be prohibited by the State.

With these principles and examples in mind, we turn to the present case. In cases raising first amendment issues, particularly ones in which it is contended that a communication is unprotected, a reviewing court undertakes an independent examination of the entire record. See *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-04, 80 L. Ed. 2d 502, 518, 104 S. Ct. 1949, 1961 (1984).

The record includes the underlying disciplinary complaint against Desnick. The complaint alleged that, in 1983, Desnick diagnosed Edward Jagel's lessening visual acuity as a cataract condition and advised him to undergo cataract surgery on his right eye. Following surgery, Jagel's condition worsened and Desnick advised him to undergo cataract surgery on his left eye. Before doing so, Jagel sought a second medical opinion and discovered that he was suffering from undiagnosed glaucoma. A suit later filed in circuit court, referenced as "Jagel v. Desnick," was ultimately settled and dismissed.

In December 1991, Desnick diagnosed Stanley Kane's lessening visual acuity as due to cataracts in both eyes and advised Kane to undergo cataract surgery for their removal. Desnick subsequently performed cataract surgery on Kane's left eye and later his right eye. Kane was examined by another physician less than one month later and learned that the cause of his condition

was malignant melanoma. The complaint alleged that Desnick was responsible for malpractice in these two instances in violation of the Medical Practice Act.

The complaint also alleged that a particular woman who worked at the Desnick Eye Center was represented by Desnick's print advertising to be a licensed physician even though she was not. This woman also conducted an eye examination of an investigator from the Department and diagnosed the investigator as suffering from cataracts. The complaint alleged that Desnick by this conduct aided and abetted the unlicensed practice of medicine in violation of the Act.

In April 1992, Desnick was a fellow of the American Academy of Ophthalmology and the subject of a challenge under the Academy's Code of Ethics which related to professional conduct or competence. He allegedly resigned from his membership during pendency of the proceedings on the challenge and did not notify the Department of Regulation in violation of the Medical Practice Act. Other allegations claimed that Desnick engaged in instances of misleading and deceptive advertising also in violation of the Act.

While we recognize that these background details are necessarily but allegations at this point, reviewing courts, in determining whether particular speech is protected, routinely consider the context of such speech, regardless of whether any particular illegality has been legally proven. See *Ragin v. New York Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991) (complaint alleged newspaper advertisements promoted housing discrimination).

On the face of it, the subject of Desnick's telephone solicitation concerns lawful activities, and the information sought to be communicated is not misleading. To the contrary, the solicitation concerns a free trip to the doctor's office for a free exam. Also, the information conveyed could be easily understood by the targeted

audience. *Cf. Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 389, 402 (1985) (information provided by marketing plans not found to be actually misleading or uninformative). The question remains, however, whether Desnick's method of solicitation, targeting elderly Medicare recipients with an inducement offer of free services that delivers them to his clinic, is inherently misleading or unlawful.

It is not unlawful for medical professionals to seek to treat government-insured individuals as opposed to others, nor would it be fair to say that medical practices, primarily composed of such individuals, even the elderly, are rife with deception. Neither is it shown that persons responding to Desnick's solicitations are persuaded in fact to have unnecessary surgeries. Unlawfulness and deceptiveness could not then be considered innate or inherent to Desnick's solicitations to induce such relationships. After careful consideration, we find that Desnick's solicitation is not inherently misleading or unlawful. Thus, we are constrained to conclude that Desnick's targeted telephone solicitations constitute protected speech under the first amendment.

However, even when a communication is not misleading, a state retains some authority to regulate it. *In re R.M.J.*, 455 U.S. at 203, 71 L. Ed. 2d at 74, 102 S. Ct. at 937. Looking to the second prong of the *Central Hudson Gas* framework, defendants contend that the State has a substantial interest in regulating the medical profession, preventing overreaching by physicians, and protecting citizens' right to privacy. Desnick concedes that the State has a substantial interest in regulating the practice of medicine, but essentially argues that defendants have not articulated interests justifying the type of prohibition posed here. We interpret Desnick's argument on this score, however, to be no more than a

synthesis of his arguments regarding the two remaining prongs of *Central Hudson Gas.*

Undoubtedly, the State has a substantial interest in regulating the medical profession. This court has long recognized, primarily under the concept of fourteenth amendment substantive due process, the right of the State to regulate advertising by those engaged in medical and related professions. *Talsky,* 68 Ill. 2d at 585 (citing cases). It is a proper exercise of police power to legislate and protect the professions performing health-related services against commercialization and exploitation. See *Talsky,* 68 Ill. 2d at 585. With respect to the first amendment, this court has also found that "the State has a very real and compelling interest in restricting the advertising of health-care services to those which are truthful, informative and helpful to the potential consumer in making an intelligent decision." *Talsky,* 68 Ill. 2d at 591. It is also recognized that the State has substantial interest in maintaining professional standards and preventing undue influence, overreaching and the invasion of its citizens' privacy. See *Ohralik,* 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912 (1978) (blanket ban on in-person attorney solicitation for pecuniary gain upheld based on such interests); see also *Florida Bar,* 515 U.S. at 624, 132 L. Ed. 2d at 54, 115 S. Ct. at 2376 (state has substantial interest in protecting its citizens from intrusions on privacy and in regulating the professions). Further, " '[t]he State's interest in protecting the well-being, tranquility, and privacy of the home' " is similarly recognized as " 'certainly of the highest order in a free and civilized society.' " See *Florida Bar,* 515 U.S. at 625, 132 L. Ed. 2d at 550, 115 S. Ct. at 2376, quoting *Carey v. Brown,* 447 U.S. 455, 471, 65 L. Ed. 2d 263, 276, 100 S. Ct. 2286, 2296 (1980). Accordingly, we conclude that defendants have satisfied the second prong of *Central Hudson Gas* by asserting substantial interests.

We must address whether the regulation directly and materially advances those interests, the third prong of *Central Hudson Gas.* Defendants contend that the potential for overreaching and abuse posed by Desnick's solicitation is manifest and not remote. Defendants contend that the nature of Desnick's elderly, Medicare-recipient targeted telephone solicitation is ripe for abuse. Defendants point out that such overreaching results in unethical subordination of medical judgment to pecuniary gain, patient medical abuse, and debasement of the profession. Defendants refer also to medical authority recognizing such harms. Defendants assert that the regulation here, like that in *Ohralik,* is an appropriate prophylactic rule designed to prevent such potential overreaching by medical professionals.

Desnick maintains that his solicitations pose no dangers. Desnick argues that defendants have not shown that in fact a problem exists and that this regulation will solve it. In contrast to the uninformed acquiescence to which accident victims were prone in *Ohralik* and *Florida Bar,* if individuals do not wish to be solicited by Desnick's telemarketers, they need only terminate the call. Furthermore, Desnick contends, a physician is not trained, like the lawyer in *Ohralik,* in the art of persuasion. Desnick notes also that it is presumed that members of respected professions are unlikely to engage in deceptive practices towards clients. See *Peel v. Attorney Registration & Disciplinary Comm'n,* 496 U.S. 91, 109, 110 L. Ed. 2d 83, 100, 110 S. Ct. 2281, 2292 (1990).

The third prong requires that a regulation impinging upon commercial expression "directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson Gas,* 447 U.S. at 564, 65 L. Ed. 2d at 350, 100 S. Ct. at 2350. The State's burden is not satisfied by mere specula-

tion and conjecture. The State must demonstrate that the harms are real and that its restriction will in fact alleviate them to a material degree. *Florida Bar*, 515 U.S. at 626, 132 L. Ed. 2d at 550, 115 S. Ct. at 2377, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 482, 131 L. Ed. 2d 532, 541-42, 115 S. Ct. 1585, 1592 (1995), quoting *Edenfield*, 507 U.S. at 770, 123 L. Ed. 2d at 555, 113 S. Ct. at 1800.

Thus, in *Ohralik*, 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912, the Court upheld as constitutional the application of a disciplinary prohibition on in-person attorney solicitation for pecuniary gain. The particular attorney had personally solicited two individuals recently injured in an auto accident in violation of the prohibition. The Court found that the State had compelling interest in *preventing* aspects of lawyer solicitation involving fraud, undue influence, intimidation, overreaching and other forms of vexatious conduct. The Court rejected the notion that actual harm was required to be demonstrated in the case. The Court considered the prohibition's basis as a professional ethics measure, detrimental aspects known to personal solicitation, lawyers' persuasive skills, the fact that an unsophisticated lay person, either injured or distressed when approached, might place trust in the lawyer, regardless of actual need for representation or the attorney's qualifications, and that such a person's plight might make uninvited overtures result in further distress.

The Court concluded that it was not unreasonable for the state to presume that such solicitation was more often than not injurious. *Ohralik* held that it was not unreasonable or violative of the Constitution for the state to respond in such circumstances with what was in effect a prophylactic rule. Application of a prophylactic rule in order to *prevent* harm was justified because the situation of in-person attorney solicitation for

pecuniary gain was "inherently conducive to overreaching and other forms of misconduct." *Ohralik*, 436 U.S. at 464, 56 L. Ed. 2d at 459, 98 S. Ct. at 1923.

However, the Court has held that a state may not place an absolute prohibition on certain types of *potentially misleading* information, *e.g.*, a listing of areas of practice, if the information also may be presented in a way that is not deceptive. *In re R.M.J.*, 455 U.S. at 203, 71 L. Ed. 2d at 74, 102 S. Ct. at 937; see also *Ardt v. Illinois Department of Professional Regulation*, 154 Ill. 2d 138, 153 (1992). The Court has suggested that the remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation. "Although the potential for deception and confusion is particularly strong in the context of advertising professional services, restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception." See *In re R.M.J.*, 455 U.S. at 203, 71 L. Ed. 2d at 74, 102 S. Ct. at 937.

Defendants refer to medical literature, authored by a leading ophthalmologist, which they originally cited in their memorandum in opposition to plaintiff's motion for preliminary injunction. See C. Margo, *Sounding Board: Selling Surgery*, 314 New Eng. J. Med. 1575-76 (1986). Dr. Margo states:

> "Ophthalmology encompasses both medical and surgical practice. It is the disparity in monetary rewards between these two areas that can be exploited by the successful businessman. Advertisements in the field of ophthalmology are almost exclusively designed to promote surgery. Billboard, radio and newspaper advertisements, and massive door-to-door solicitation using leaflets, as is carried out in Tampa, can seriously mislead the public about the risks of and indications for eye surgery. ***
>
> *   *   *
>
> *** Surgical entrepreneurism can undermine the credibility of ophthalmology by eroding public confidence and may adversely effect [*sic*] the moral [*sic*] of the profession.

When advertising informs people of services they might not otherwise have known about, it serves an important function. It is difficult, however, to reconcile an alternative purpose of advertising—to convince people to want something they don't necessarily need—with the goals of medicine—to reduce suffering and cure disease." C. Margo, *Sounding Board: Selling Surgery*, 314 New Eng. J. Med. 1575-76 (1986).

Dr. Margo also points out that promoting free medical care to Medicare recipients also provides the potential for abuse where the patient is not informed that not all procedures are completely covered. Moreover, solicitation of surgical patients places a physician in a position of subordinating his medical judgment to pecuniary gain.

Defendants also refer to an American Medical Association opinion, explaining why the medical and legal professions have longstanding limitations (previously prohibitions) on advertising. "Physicians *** have an ethical duty to subordinate financial reward to social responsibility. A physician should not engage in practices for pecuniary gain that interfere with his medical judgment ***." See *In re American Medical Ass'n*, 94 F.T.C. 701, 1034-35 (AMA 1977).

We are not compelled to ignore the record. Desnick is alleged to have performed unwarranted cataract surgeries, engaged in false and deceptive advertising, aided and abetted the unlicensed practice of medicine, and failed to report challenge to his professional competency. Moreover, the very fact that Desnick targets elderly, Medicare-insured individuals and seeks to physically bring them into his clinic for ostensibly "free" services reveals that his pecuniary interests likely predominate medical issues.

In many ways, what could be said of the attorney personal solicitation in *Ohralik* can be said of the targeted telephone solicitations here. An unsophisti-

cated lay individual is confronted with an intrusion into his or her privacy by an expert persuader, in this case, a telemarketer. Due to the individual's particular susceptibility and vulnerability, that individual becomes positioned such that it is likely he or she will place unwarranted trust in a professional, possessing superior knowledge, and motivated by pecuniary considerations.

Based on the above, we find that the risk of harm here is not remote or speculative. Rather, the solicitation is just the sort "inherently conducive to overreaching and other forms of misconduct." *Ohralik*, 436 U.S. at 464, 56 L. Ed. 2d at 459, 98 S. Ct. at 1923. We disagree with Desnick that defendants need to support this prong with some requisite amount or type of data or anecdote. As *Florida Bar* stated:

> "[W]e do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether [citations] or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and *'simple common sense,'* [citation]. Nothing in *Edenfield, supra,* a case in which the State offered no evidence or anecdotes in support of its restriction, requires more." (Emphasis omitted.) *Florida Bar*, 515 U.S. at 628, 132 L. Ed. 2d at 552, 115 S. Ct. at 2378.

Indeed, the Court has upheld speech restrictions based on such commonsense links in *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 428, 125 L. Ed. 2d 345, 356, 113 S. Ct. 2696, 2704 (1993), and *Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico*, 478 U.S. 328, 341-43, 92 L. Ed. 2d 266, 280-82, 106 S. Ct. 2968, 2976-78 (1986).

We find that, by prohibiting licensed physicians or their representatives from engaging in solicitation for professional patronage, section 22(A)(24) directly and

materially accomplishes the prevention of the potential harms demonstrated here.

Turning to the fourth *Central Hudson Gas* prong, that the regulation is to be "narrowly drawn" does not indicate the application of the "overbreadth doctrine" to scrutiny of commercial speech. See *Central Hudson Gas*, 447 U.S. at 565 n.8, 65 L. Ed. 2d at 350 n.8, 100 S. Ct. at 2351 n.8. Also, the term does not connote a "least restrictive means" test. See *Board of Trustees of the State University of New York*, 492 U.S. at 479, 106 L. Ed. 2d at 403, 109 S. Ct. at 3034. Instead, the Court has stated:

> "What our decisions require is a ' "fit" between the legislature's ends and the means chosen to accomplish those ends,' [citation]—*a fit that is not necessarily perfect, but reasonable*; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' [citation] that employs not necessarily the least restrictive means but *** a means narrowly tailored to achieve the desired objective." (Emphasis added.) *Board of Trustees of the State University of New York*, 492 U.S. at 480, 106 L. Ed. 2d at 403-04, 109 S. Ct. at 3035.

A state may lawfully regulate only to the extent that the regulation furthers the state's substantial interest. *In re R.M.J.*, 455 U.S. at 203, 71 L. Ed. 2d at 74, 102 S. Ct. at 937-38.

By declining to impose a least restrictive means test, the Court took account of the "difficulty of establishing with precision the point at which restrictions become more extensive than their objective requires" and extended the legislative and executive branches' "needed leeway" regarding commercial speech which is " 'traditionally subject to governmental regulation.' " *Board of Trustees of the State University of New York*, 492 U.S. at 481-82, 106 L. Ed. 2d at 404, 109 S. Ct. at 3035, quoting *Ohralik*, 436 U.S. at 456, 56 L. Ed. 2d at 453, 98 S. Ct. at 1918. "With respect to this prong, the differences between commercial speech and noncommercial speech

are manifest." *Florida Bar*, 515 U.S. at 632, 132 L. Ed. 2d at 554, 115 S. Ct. at 2380.

Defendants urge that section 22(A)(24)'s prohibition against physicians' solicitations for patients is an appropriate response to prevent overreaching and its attendant evils. Defendants argue that any regulation purporting to narrow the target, in this area, to specific types of speech or with disclaimers would not achieve the State's interests in preventing potential abuse and protecting the public from intrusions of privacy. Desnick replies that the provision as written is applicable even to forms of solicitation that are not inherently misleading. He posits that the State could limit the regulation by restricting false, fraudulent, deceptive or misleading solicitation or consider limitations on time, manner or mode of solicitation. He points to the fact that the Act contains numerous provisions prohibiting false and misleading conduct. 225 ILCS 60/22(A)(5) (West 1994).

We do not believe that the statement of narrower terms in section 22(A)(24) would effectively further the State's interests in preventing overreaching by medical professionals and protecting potential citizen patients from intrusions. This case compares favorably with the situation of in-person attorney solicitation prohibited in *Ohralik*. Like the situation there, a disclaimer or a ban against fraud or abusive practices would have little effect. Verbal or telephonic solicitation like that in *Ohralik* is not readily susceptible to review by the State. Further, the audience which receives physicians' solicitations, the medical public composed of potential clients, have peculiar susceptibilities and vulnerabilities because of their needs and desires to be healthy. In the case of physician solicitation, as opposed to other professional solicitations, such as attorneys or CPA's, the compromise of professional judgment is potentially more injurious. Also, in the case of physicians drumming up

business, that possible compromise more easily arises from the mere fact that the physician initiated the one-on-one patient contact in the first place.

That the Act forbids or differentiates certain conduct says nothing about possible effective differentiation as to speech and its resultant effects. Also, Desnick's objection that nonmisleading speech, or protected speech, is prohibited by the provision speaks essentially to overbreadth considerations. The area here is commercial speech and, on balance with the State's substantial interests, that speech may be burdened where appropriate.

We find that there exists a reasonable fit between the State's substantial interests in preventing the risk of medical professional overreaching and abuse and in protecting the public from intrusions into their privacy and section 22(A)(24)'s prohibition against physician solicitations. We hold that section 22(A)(24) may be constitutionally applied to prohibit Desnick's targeted telephone solicitations to elderly Medicare recipients.

### Vagueness Challenge

Defendants assert the trial court erred in finding section 22(A)(24) unconstitutionally vague. Desnick responds that the trial court correctly ruled that the provision is unconstitutionally vague by virtue of the entire phrase "solicitation of professional patronage." Defendants point out, however, that although Desnick initially argued below that this entire phrase rendered the provision vague, the bulk of his argument focused on the single word "solicitation." Given that Desnick's argument to the circuit court narrowed to an attack based on this single term, we agree with defendants that the circuit court apparently found the provision vague by virtue of the term "solicitation." We, accordingly, address that concern.

Notably, Desnick's challenge appears not to be based

on the notion that the provision is vague as applied to his conduct, but with respect to medical professionals, generally. Desnick does not argue that he was not given fair notice of what conduct was violative of the provision or that its operation had a chilling effect on his exercise of first amendment rights. Desnick argues that medical professionals must guess whether their conduct constitutes solicitation and that the provision might have chilling effect on medical professionals' exercise of first amendment rights. Thus, Desnick's standing to bring this challenge is asserted apparently on the basis that the provision is vague, not as applied to him, but in all its applications. *Cf. Parker v. Levy*, 417 U.S. 733, 753-58, 41 L. Ed. 2d 439, 456-59, 94 S. Ct. 2547, 2560-62 (1974); see also *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 29 L. Ed. 2d 214, 217, 91 S. Ct. 1686, 1688 (1971).

The fourteenth amendment's due process clause "insist[s] that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 227, 92 S. Ct. 2294, 2298-99 (1972). Additionally, in order to prevent arbitrary and discriminatory enforcement, laws must provide explicit standards for those who apply them. *Grayned*, 408 U.S. at 108, 33 L. Ed. 2d at 227, 92 S. Ct. at 2298-99.

Reiterating these concepts, this court recently stated that a statute violates due process under either the United States Constitution or the Illinois Constitution on the basis of vagueness "only if its terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts *** due process requires that a statute must not be so vague that men of common intelligence must necessarily guess at its ap-

plication or meaning." *People v. Burpo*, 164 Ill. 2d 261, 266 (1995).

The Court has held that "[s]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech \*\*\*." *Hynes v. Mayor & Council*, 425 U.S. 610, 620, 48 L. Ed. 2d 243, 253, 96 S. Ct. 1755, 1760 (1976); see also *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 501-03, 71 L. Ed. 2d 362, 373-74, 102 S. Ct. 1186, 1194-95 (1982); *Penny Saver Publications v. Village of Hazel Crest*, 905 F.2d 150, 155 (1990). The Court has not, however, formulated a doctrinal statement of this standard.

Desnick argues that section 22(A)(24) is more vague than the ordinance applicable to newspaper advertisers that was held unconstitutional in *Penny Saver*.

In *Penny Saver*, a village ordinance prohibited solicitation of any homeowner or occupant of dwellings to sell, rent or list after such persons had notified the village clerk that they did not want to be solicited. The ordinance defined "solicitation" to mean any conduct by a real estate agent intended to induce a dwelling owner in the village to sell, rent or list. The ordinance purported to regulate real estate solicitations. A real estate broker was subsequently prosecuted under the ordinance after certain residents, listed on the antisolicitation list, complained because the broker had placed a flyer, adverting his services, in a local newspaper that was delivered free to the homes in the village. The broker and other real estate advertisers subsequently avoided placing ads in the paper. The court held the ordinance impermissibly vague as applied to potential advertisers in newspapers because it did not inform them that print advertisements were included within the realm of the definition of solicitation. Because of the village's enforcement practices, these persons were nec-

essarily required to speculate as to the meaning of the ordinance.

Desnick's reliance on *Penny Saver* in the context of this case is misplaced. *Penny Saver* represents an as-applied challenge case with standing predicated on consequential economic damage to an entity before the court, which directly resulted from the actual chilling effect on the first amendment rights of realtors who declined to advertise. *Penny Saver*, 905 F.2d at 154. This chilling effect resulted because, given what the ordinance purported to do, it was unclear whether their mode of communication fell within the definition of solicitation. *Penny Saver* held that the ordinance, directed to real estate agents and brokers, was unconstitutionally vague "as applied" to potential advertisers in newspapers.

In contrast, Desnick has not contended that the provision here was vague "as applied" to him such that he did not know whether his mode of solicitation was within the term. Indeed, it can hardly be contended by Desnick that he could not know that his telephone calls to Medicare recipients to come to his clinic did not fall within the term "solicitation" or "solicitation of professional patronage." Unlike the newspaper's reluctant advertisers in *Penny Saver*, Desnick has no argument that the provision is vague as applied to him. It clearly is not. In sum, *Penny Saver* does not support the proposition that section 22(A)(24) is unconstitutionally vague in all its applications.

With respect to that argument, we disagree with Desnick that under the regulation medical professionals must guess whether their conduct constitutes solicitation, or that the Department is given unfettered discretion in prosecuting under the regulation.

The term "solicit" has been defined as:

"To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of

receiving \*\*\* to try to obtain \*\*\* [t]he term implies personal petition and importunity addressed to a particular individual to do some particular thing." Black's Law Dictionary 1392 (6th ed. 1990).

Accord *People v. Beaulieu Realtors, Inc.*, 144 Ill. App. 3d 580, 585 (1986). "Solicit" is also more commonly defined as "to make petition to: ENTREAT; \*\*\* to approach with a request or plea; \*\*\* to strongly urge (as one's cause)." Webster's Ninth New Collegiate Dictionary 1122 (1991).

"A statute will be considered unconstitutionally vague on its face only where it is incapable of any valid application in the sense that no standard of conduct is specified at all." *Burpo*, 164 Ill. 2d at 266. We believe the term "solicit" has a readily discernible common meaning sufficient to notify physicians and their representatives as well as guide the State concerning what conduct is prohibited. Combined with the term "professional patronage," the regulation plainly forbids physicians from initiating requests for business. We find section 22(A)(24) constitutional on this basis.

Trial Court's Denial of Defendants' Motion to Dismiss

Desnick named both the Department and Director Zollar as defendants in this lawsuit. The Department moved to dismiss the action against it for lack of subject matter jurisdiction on grounds of sovereign immunity. It conceded that subject matter jurisdiction existed as to Director Zollar. As we indicated previously, the circuit court subsequently denied the motion to dismiss.

Desnick correctly points out that a denial of a motion to dismiss is not a final determination, but is interlocutory. See *Chapman v. United Insurance Co. of America*, 234 Ill. App. 3d 968, 970 (1992); *Pizzato's Inc. v. City of Berwyn*, 168 Ill. App. 3d 796, 798 (1988) (denial of motion to dismiss on basis of governmental immunity not final and appealable order). Further, defendants did not

specify the denial of their motion to dismiss in their notice of appeal. Our rules authorizing appeals from certain interlocutory orders, as was the grant of a preliminary injunction here, do not allow for review of other nonfinal orders entered by the circuit court.

Because we rule that the grant of a preliminary injunction was an abuse of discretion, we need not reach defendants' argument that we ought to review the trial court's denial of the Department's motion to dismiss for want of subject matter jurisdiction as attendant and integral to that grant. See *Olympic Federal v. Witney Development Co.*, 113 Ill. App. 3d 981, 984-85 (1983); *cf. Rosina v. Gusmano*, 90 Ill. App. 3d 882, 886-87 (1980). The trial court improperly enjoined the defendants, and the cause will be remanded to the circuit court for further disposition.

## Conclusion

Because we have found section 22(A)(24) constitutional under the first amendment as applied to prohibit plaintiff's telephone solicitation, and constitutional in terms of vagueness, the trial court clearly abused its discretion in finding grounds to grant plaintiff's motion for a preliminary injunction. We reverse that ruling and remand to the trial court for disposition not inconsistent with this opinion.

*Reversed and remanded.*

JUSTICE McMORROW, dissenting:

The majority concludes that section 22(A)(24) of the Illinois Medical Practice Act of 1987 (Ill. Rev. Stat. 1991, ch. 111, par. 4400—1 *et seq.*) may be applied, consistent with the free speech provisions of the federal and state constitutions, to prohibit Desnick's direct telephone marketing. I dissent because I believe the majority has engaged in a premature "as applied" analysis of the free speech issue and because, even if an "as applied"

analysis is appropriate at this stage of the proceedings, I do not believe Desnick's speech may be constitutionally prohibited.

At the outset it is to be noted that no argument has been made nor is there any suggestion in the record that Desnick's telemarketing speech is misleading, untruthful or unlawful. It is well established that commercial speech which is neither misleading nor unlawful is entitled to the protections of the free speech provisions of the federal and state constitutions. "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 561-62, 65 L. Ed. 2d 341, 348, 100 S. Ct. 2343, 2349 (1980). Indeed, " 'a particular consumer's interest in the free flow of commercial information *** may be as keen, if not keener by far, than his interest in the day's most urgent political debate.' " *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481-82, 131 L. Ed. 2d 532, 538, 115 S. Ct. 1585, 1589 (1995), quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763, 48 L. Ed. 2d 346, 359, 96 S. Ct. 1817, 1826 (1976). Accordingly, in addressing the free speech issue in the case at bar, we must proceed cautiously, and take care to identify precisely the nature of the questions before us, lest we impermissibly intrude upon significant constitutional freedoms.

Section 22(A)(24) provides that any licensed practitioner of medicine may be disciplined for engaging in "[s]olicitation of professional patronage by any corporation, agents or persons, or profiting from those representing themselves to be agents of the licensee." Ill. Rev. Stat. 1991, ch. 111, par. 4400—22(A)(24). In October 1992, the Department of Professional Regulation (the Depart-

ment) filed an administrative disciplinary complaint in which it alleged that Desnick violated section 22(A)(24) by using a telemarketing firm to telephone individuals who were 65 years of age and older. These individuals allegedly were offered a free eye examination appointment and free transportation to the Desnick Eye Center, provided they answered a series of scripted questions which indicated that they had not previously visited the Desnick Eye Center; did not have a personal ophthalmologist; received Medicare; and did not belong to a health maintenance organization.

In response to the Department's administrative complaint, Desnick commenced this separate action in the circuit court of Cook County. In his complaint, Desnick requested a declaration that the absolute ban on physician solicitation contained in section 22(A)(24) is unconstitutional on its face and, in addition, requested permanent injunctive relief. In October 1994, Desnick moved for a preliminary injunction to prevent the Department from enforcing section 22(A)(24) against him. In December 1994, the circuit court granted the preliminary injunction and enjoined the Department from enforcing section 22(A)(24) pending a determination of the merits of the action. The circuit court found, *inter alia*, that Desnick was likely to succeed on the merits because section 22(A)(24) violated the free speech provisions of the federal and state constitutions.

I agree with the majority's preliminary determination that this court has jurisdiction to review the instant case. However, I note the somewhat unusual posture in which this matter has come before us. The purpose of a preliminary injunction is to preserve the *status quo* of the parties before the court, not to make a final determination on the merits of permanent injunctive relief. *People ex rel. Sklodowski v. State*, 162 Ill. 2d 117, 131 (1994); *Buzz Barton & Associates, Inc. v. Giannone*, 108

Ill. 2d 373, 386 (1985). "The purposes of [the preliminary and permanent injunctions] are different and distinct. The proof that is required to support them is not the same." *Buzz Barton*, 108 Ill. 2d at 386. In the instant case, by declaring section 22(A)(24) unconstitutional, the circuit court went beyond maintaining the *status quo* and rendered what was, in effect, a final adjudication on the merits. This conclusion was reached following a preliminary injunction proceeding in which no discovery took place and no evidentiary record was established. While a lack of an evidentiary record may not be problematic in reviewing every instance where permanent injunctive relief is granted, as discussed below, I believe it has created difficulties in the case at bar. However, because the circuit court entered an order declaring section 22(A)(24) unconstitutional, I agree that this court has jurisdiction to hear the instant appeal.

Having determined that this court has jurisdiction, the majority next addresses the free speech issue. Despite the lack of an evidentiary record, and despite the fact that Desnick raised a *facial* challenge to section 22(A)(24) in both the circuit court and this court, the majority concludes that Desnick's free speech argument must be treated as a challenge to the constitutional validity of section 22(A)(24) *as applied* to his particular speech. The majority reasons that because Desnick may not contest section 22(A)(24) on facial overbreadth grounds, his argument must be reviewed as an applied challenge. I agree with the majority that Desnick's facial attack on section 22(A)(24) is, fundamentally, an overbreadth argument. Desnick contends that some physician solicitation is constitutional and therefore, because section 22(A)(24) bans all physician solicitation, that section is unconstitutionally overbroad. I also agree with the majority that Desnick may not successfully contest the constitutionality of section 22(A)(24) on

overbreadth grounds. The Supreme Court has made clear that a facial overbreadth challenge is not available to plaintiffs contesting the validity of a statute regulating commercial speech. *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 106 L. Ed. 2d 388, 109 S. Ct. 3028 (1989). While it is not the case that a plaintiff may never facially challenge a statute regulating commercial speech (see, *e.g., Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico*, 478 U.S. 328, 92 L. Ed. 2d 266, 106 S. Ct. 2968 (1986) (examining facial validity of law regulating commercial speech under *Central Hudson Gas* test)), in the case at bar, Desnick's particular facial challenge is not viable.

However, the fact that Desnick's facial argument is ineffective does not mean that this court may, by default, review Desnick's challenge on an unconstitutional as applied basis. As a general rule, courts do not rule on the constitutionality of statutes during preliminary injunction hearings. *Sklodowski*, 162 Ill. 2d at 132, quoting *Toushin v. City of Chicago*, 23 Ill. App. 3d 797, 803 (1974); *Regional Transportation Authority v. Burlington Northern, Inc.*, 100 Ill. App. 3d 779, 786 (1981). This is so because a preliminary injunction is an emergency measure, and the hearing which accompanies the preliminary injunction is, by design, truncated. Any "facts" produced during such a proceeding are not binding for purposes of a trial on the merits (*Electronic Design & Manufacturing, Inc. v. Konopka*, 272 Ill. App. 3d 410, 411 n.1 (1995)) because those "facts" may be significantly altered once a trial on the merits is held. Logically then, the general rule that statutes should not be declared unconstitutional during preliminary injunction hearings applies with even greater force in instances where the allegation is that the statute is unconstitutional as applied. See, *e.g., Walters v. National*

*Ass'n of Radiation Survivors*, 473 U.S. 305, 87 L. Ed. 2d 220, 105 S. Ct. 3180 (1985) (O'Connor, J., concurring, joined by Blackmun, J.).

In the case at bar, Desnick's complaint contested the facial validity of section 22(A)(24). As such, Desnick never stipulated to the nature or existence of his telemarketing. Indeed, Desnick maintained that the facts regarding his particular solicitations were "irrelevant" to his facial challenge. The circuit court agreed with Desnick and denied the Department's repeated requests to develop an evidentiary record. By reviewing Desnick's argument as an unconstitutional as applied challenge, the majority today decides the merits of this case, not on the basis of evidence, but on the basis of the Department's untested allegations. My research has revealed no case—nor has the majority cited to any— which holds that an allegation in a disciplinary complaint may be taken as true for purposes of deciding, on the merits, that a statute may be applied to a plaintiff who is contesting the constitutional validity of that statute. It is entirely premature, especially in light of the intensive, fact-oriented nature of commercial speech doctrine, to engage in an "as applied" analysis at this stage of the proceedings. I submit that the proper remedy in the case at bar is to vacate that portion of the circuit court's order declaring section 22(A)(24) unconstitutional under the free speech provisions of the federal and state constitutions and remand for a full proceeding on the merits.

While I do not believe that this court should be addressing the merits of an "as applied" free speech challenge to section 22(A)(24) at this time, in light of the majority's disposition, I nevertheless feel compelled to address the issue. In the following discussion, I proceed under the assumption that the Department's allegations regarding Desnick's telephone marketing are, in fact, true.

In its original multicount disciplinary complaint, the Department alleged other charges against Desnick, including several counts of malpractice. However, the only count at issue in the case at bar is the count concerning Desnick's direct telephone marketing. Despite the majority's repeated references to the Department's other allegations, those counts are irrelevant to the sole issue before us, *i.e.*, the free speech issue. *Ragin v. New York Times Co.*, 923 F.2d 995 (2d Cir. 1991), cited by the majority (171 Ill. 2d at 526), is not to the contrary. At issue in *Ragin* was whether an action brought against a newspaper publisher could withstand a motion to dismiss where the complaint alleged that models used in housing advertisements in a newspaper indicated racial preference in violation of the Fair Housing Act. The court concluded that an ad which indicated racial preference furthered an illegal end and could not be considered protected commercial speech. Therefore, the plaintiffs had alleged facts sufficient to withstand a motion to dismiss. *Ragin*, 923 F.2d at 1002-03. *Ragin* does *not* stand for the proposition that other unrelated and *unproven* allegations may be used to buttress the conclusion that Desnick's speech may constitutionally be prohibited. Thus, with respect to the free speech issue, the narrow question before us is whether the Department's enforcement of section 22(A)(24) against Desnick's phone marketing, standing alone, is unconstitutional.

The constitutionality of prohibiting Desnick's telephone marketing must be addressed by applying the framework for analyzing commercial speech articulated in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 65 L. Ed. 2d 341, 100 S. Ct. 2343 (1980). Under the *Central Hudson Gas* test, commercial speech which is not misleading or unlawful may be restricted only if the government's interest in doing so

is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than necessary to serve that interest. *Central Hudson Gas*, 447 U.S. at 565-66, 65 L. Ed. 2d at 350-51, 100 S. Ct. at 2351. Further, the State's burden to demonstrate that the challenged regulation directly advances the government's interest "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 771, 123 L. Ed. 2d 543, 555, 113 S. Ct. 1792, 1800 (1993).

The majority acknowledges that, even if the Department's allegations are accepted as true, there is no direct evidence of harm resulting from Desnick's phone calls.[1] 171 Ill. 2d at 527 ("Neither is it shown that persons responding to Desnick's solicitations are persuaded in fact to have unnecessary surgeries"). Relying on *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912 (1978), the majority then concludes that because of the *potential* for harm resulting from Desnick's telephone marketing, the prohibition of that speech is justified as a *preventative* measure. However, *Ohralik* does not support the position of the majority.

In *Ohralik*, a disciplinary rule prohibiting in-person solicitation was applied to an attorney who approached two victims of an automobile accident in order to secure agreements to represent them in subsequent litigation.

---

[1]The majority cites to an article from a medical journal which asserts, in general terms, that advertising by ophthalmologists may harm the profession. However, the article does not discuss the facts of this case and, at this point, is little "more than a series of conclusory statements that add little if anything to the [Department's] original statement of its justifications." *Edenfield*, 507 U.S. at 771, 123 L. Ed. 2d at 556, 113 S. Ct. at 1801.

The attorney had visited one of the victims while she was still in traction in a hospital bed, and the other victim shortly after she had returned home from the hospital. The Supreme Court concluded that a preventative rule was justified under these circumstances because the situation presented was "inherently conducive to overreaching and other forms of misconduct." *Ohralik*, 436 U.S. at 464, 56 L. Ed. 2d at 459, 98 S. Ct. at 1923. The Court explained:

"[T]he potential for overreaching is significantly greater when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person. Such an individual may place his trust in a lawyer, regardless of the latter's qualifications or the individual's actual need for legal representation, simply in response to persuasion under circumstances conducive to uninformed acquiescence. Although it is argued that personal solicitation is valuable because it may apprise a victim of misfortune of his legal rights, the very plight of that person not only makes him more vulnerable to influence but also may make advice all the more intrusive. Thus, under these adverse conditions the overtures of an uninvited lawyer may distress the solicited individual simply because of their obtrusiveness and the invasion of the individual's privacy, even when no other harm materializes. Under such circumstances, it is not unreasonable for the State to presume that in-person solicitation by lawyers more often than not will be injurious to the person solicited." *Ohralik*, 436 U.S. at 465-66, 56 L. Ed. 2d at 459-60, 98 S. Ct. at 1923-24.

Subsequent Supreme Court decisions have made clear that the holding in *Ohralik* is a narrow one and that *Ohralik* "does not stand for the proposition that blanket bans on personal solicitation by all types of professionals are constitutional in all circumstances." *Edenfield*, 507 U.S. at 774, 123 L. Ed. 2d at 557, 113 S. Ct. at 1802. Instead, "the constitutionality of a ban on personal solicitation will depend upon the identity of the parties and the precise circumstances of the solicita-

tions." *Edenfield*, 507 U.S. at 774, 123 L. Ed. 2d at 557, 113 S. Ct. at 1802.

In the instant case, the circumstances presented do not support the preventative ban on Desnick's telephone marketing. First, while it was appropriate in *Ohralik* to conclude that the personal injury victims were left in a vulnerable physical and emotional condition because of their automobile accident, I do not think it is appropriate to conclude that because an individual is 65 years old or on Medicare he or she is particularly susceptible to the entreaties of a telemarketer or is incapable of rejecting Desnick's offers. *Cf. Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 132 L. Ed. 2d 541, 115 S. Ct. 2371 (1995) (individuals targeted for solicitation in the immediate aftermath of an accident or disaster had significant privacy interest because of their special vulnerability in a time of personal grief and trauma); *In re Komar*, 125 Ill. 2d 427, 446 (1988) (upholding discipline of attorney who engaged in untruthful and in-person solicitation of mortgage foreclosure defendants characterized by the court as "desperate and distraught").

Moreover, even if it can be concluded that the group of individuals solicited in the case at bar are incapable of effectively dealing with telemarketers, that fact alone is not dispositive. In *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 100 L. Ed. 2d 475, 108 S. Ct. 1916 (1988), an attorney requested permission from the appropriate state authority to send the following letter to persons who had foreclosure suits filed against them:

" 'It has come to my attention that your home is being foreclosed on. If this is true, you may be about to lose your home. Federal law may allow you to keep your home by *ORDERING* your creditor [*sic*] to *STOP* and give you more time to pay them.

'You may call my office anytime from 8:30 a.m. to 5:00 p.m. for *FREE* information on how you can keep your home.

'Call *NOW*, don't wait. It may surprise you what I may be able to do for you. Just call me and tell me that you got this letter. Remember it is *FREE*, there is *NO* charge for calling.' " (Emphasis in original.) *Shapero*, 486 U.S. at 469, 100 L. Ed. 2d at 482, 108 S. Ct. at 1919.

The state authority denied the attorney's request. Upon review, the Supreme Court struck down the state's preventative ban, even though the attorney's mailing was targeted to those who were in a vulnerable position. The Court noted that the relevant inquiry was not whether there existed potential clients whose condition made them susceptible to undue influence, but whether the *"mode of communication"* posed a serious danger that lawyers would exploit any such susceptibility. (Emphasis added.) *Shapero*, 486 U.S. at 474, 100 L. Ed. 2d at 485, 108 S. Ct. at 1922. The Court concluded that the mailing did not pose the same risk of overreaching as did in-person solicitation.

In the instant case, the alleged "mode of communication" is scripted, telephone marketing. In the series of Supreme Court decisions regarding the first amendment protection afforded attorneys' commercial speech, the Court has not addressed telephone marketing. However, the Court has consistently drawn a distinction between face-to-face solicitation and print or mail solicitation. Compare *Ohralik*, 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912, with *Shapero*, 486 U.S. 466, 100 L. Ed. 2d 475, 108 S. Ct. 1916, and *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 85 L. Ed. 2d 652, 105 S. Ct. 2265 (1985). In upholding the ban on in-person solicitation in *Ohralik*, the Court noted two principal reasons for differentiating between in-person solicitation and other methods of soliciting business. First, unlike print or mail advertising, "in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection." *Ohralik*, 436 U.S. at 457,

56 L. Ed. 2d at 454, 98 S. Ct. at 1919. Thus, the "imminence of harm" is a factor that makes in-person solicitation less protected than other forms of solicitation. *Ohralik*, 436 U.S. at 457 n.13, 56 L. Ed. 2d at 454 n.13, 98 S. Ct. at 1919 n.13; see also *Zauderer*, 471 U.S. at 642, 85 L. Ed. 2d at 667, 105 S. Ct. at 2277 ("a printed advertisement, unlike a personal encounter initiated by an attorney, is not likely to involve pressure on the potential client for an immediate yes-or-no answer to the offer of representation"). Second, "[u]nlike the reader of an advertisement, who can 'effectively avoid further bombardment of [his or her] sensibilities simply by averting [his or her] eyes,' [citations] the target of the [in-person] solicitation may have difficulty avoiding being importuned and distressed *** ." *Ohralik*, 436 U.S. at 465 n.25, 56 L. Ed. 2d at 459 n.25, 98 S. Ct. at 1923 n.25; see also *Shapero*, 486 U.S. at 475-76, 100 L. Ed. 2d at 486, 108 S. Ct. at 1923 ("A letter, like a printed advertisement (but unlike a lawyer), can readily be put in a drawer to be considered later, ignored, or discarded").

Neither of the factors which differentiated in-person solicitation and permitted the preventative suppression of speech in *Ohralik* is present in the case at bar. There is no immediate threat of harm from Desnick's phone calls. Unlike the situation in *Ohralik*, where the attorney pressed the accident victims for an immediate, signed agreement to represent the victims, the Department has not alleged that any financial commitments or agreements to perform surgery were made during the phone calls. In the instant case, the only immediate result of a successful phone call is the scheduling of an eye examination—a result which can be reconsidered once the call has ended and which is easily cancelled or avoided. *Cf. Zauderer*, 471 U.S. at 642, 85 L. Ed. 2d at 667, 105 S. Ct. at 2277. Indeed, the telemarketing script

contained in the pleadings directs the telemarketer to close the phone call by saying: "If you change your mind about attending the eye examination, or have any questions, please call this toll free number during business hours: 1-800-EYE-CARE." This is an altogether different situation than that present in *Ohralik*. See *Texans Against Censorship, Inc., v. State Bar of Texas*, 888 F. Supp. 1328, 1353 (E.D. Tex. 1995) (upholding ban on attorney phone solicitation, in part because recipients of phone calls could be pressured into forming oral contract for representation over the phone); *Florida Bar*, 515 U.S. at 630, 132 L. Ed. 2d at 553-54, 115 S. Ct. at 2379 (attorneys' direct mail solicitation of personal injury victims within 30 days of accident or disaster was immediately harmful because receipt of letter confronted victims with information about their misfortunes while their "wounds [were] still open"). Also, like the reader who can "avert his eyes" if bothered by a print advertisement, if an individual is bothered by the phone call, that individual can simply terminate the call. See *Texans Against Censorship*, 888 F. Supp. at 1353 ("recipients of telephone solicitations have a much more effective means of ending unpleasant or harassing calls than those subjected to an in-person solicitation").

In the instant case, if it had been alleged, for example, that the telemarketers were asking individuals known to have eye problems to purchase medical services, and if the telemarketers requested or procured a credit card number for payment, I would be more inclined to equate such an operation with that in *Ohralik*. In the absence of such or similar circumstances, however, I believe it is inappropriate to make such a comparison. Indeed, by doing so, the majority has improperly extended the limited holding of the *Ohralik* decision.

In reaching this conclusion I emphasize that I do not

suggest that Desnick be permitted to engage in malpractice or the mistreatment of patients. If the separate counts alleging malpractice are proven, then Desnick should be appropriately disciplined. However, we should not lose sight of the fact that the malpractice counts are not relevant to whether a *preventative* rule, as applied to the circumstances alleged here, is likely to survive constitutional scrutiny.

As the Supreme Court has noted, " '[b]road prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' " *Edenfield,* 507 U.S. at 777, 123 L. Ed. 2d at 559, 113 S. Ct. at 1803-04, quoting *National Ass'n for the Advancement of Colored People v. Button,* 371 U.S. 415, 438, 9 L. Ed. 2d 405, 421, 83 S. Ct. 328, 340 (1963). The majority's decision sweeps too broadly. The majority's decision allows the State to constitutionally prohibit commercial speech which is truthful, nonmisleading and poses no imminent threat of harm. The negative impact of the majority decision on telemarketing is substantial and unnecessary. The perceived harm to the public from the conduct involved in this case is either nonexistent or speculative. This is an unfortunate precedent which encroaches on fundamental constitutional rights of free speech and one which is not supported by the relevant Supreme Court decisions. Therefore, I respectfully dissent.

### Dissenting Opinion Upon Denial of Rehearing

JUSTICE McMORROW, dissenting:

I write today to emphasize again my strong and sustained disagreement with the decision of the majority in this case. Dr. Desnick has been deprived of both his procedural and substantive constitutional rights as a result of this court's decision. He has never had his day

in court: no evidence was ever presented against him, no opportunity to rebut was ever afforded him; yet it has been decided by the majority that the State may prohibit and suppress his *alleged* speech, not because it was harmful or untruthful, but as a preventative measure. I cannot countenance such an unjust result.

The majority has concluded that section 22(A)(24) of the Illinois Medical Practice Act of 1987 (Ill. Rev. Stat. 1991, ch. 111, par. 4400—1 *et seq.*) may be applied to prohibit Desnick's speech under the "circumstances" of the case at bar. *Desnick v. Illinois Department of Professional Regulation*, 171 Ill. 2d 510, 513 (1996). In light of the procedural posture in which we received this case (see 171 Ill. 2d at 543-44 (McMorrow, J., dissenting)), one can only respond to this conclusion with a question: *what* circumstances? Dr. Desnick's complaint before the circuit court challenged only the facial validity of section 22(A)(24). No discovery took place, no testimony was taken, no evidence of any kind was presented to the court. Yet, incredibly, the majority, *sua sponte* and without the benefit of an evidentiary hearing, reaches the conclusion that section 22(A)(24) may be constitutionally applied to prohibit Dr. Desnick's *alleged* speech. It is axiomatic that this court will not render advisory opinions, give legal advice as to future events, or reach issues which are not essential to the disposition of the cause before it. See, *e.g.*, *People ex rel. Sklowdowski v. State of Illinois*, 162 Ill. 2d 117, 130-31 (1994); *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990); *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99 (1990). It is incomprehensible to me that the majority feels justified in reaching the merits of a constitutional as applied challenge (although such a challenge was not argued to the circuit court) without the presentment or circuit court's consideration of any evidence.

Equally as disturbing as the majority's headlong

rush to reach its unfounded result in this case is the analysis employed in obtaining that result. In conducting its constitutional as applied analysis, the majority relies heavily upon separate, *unproven* allegations in the Department of Professional Regulation's disciplinary complaint which charged Dr. Desnick with malpractice and other forms of misconduct. The Department never argued that these separate charges were related in any way to Dr. Desnick's telemarketing, and the circuit court noted that they were irrelevant to the sole issue before it, *i.e.*, the free speech issue. More importantly, even a cursory examination of the record in the case at bar reveals that the separate allegations regarding Dr. Desnick's misconduct are just that—allegations, and nothing more. Dr. Desnick may have committed these separate acts, and then again, he may not have. Again, no evidence has been presented to conclude or assume that he committed these separate acts. Thus, at this juncture, *we do not know what, if any, Dr. Desnick has done.* By relying on these separate, unproven allegations, the majority has itself ignored the record before it; and, in the process, dispensed with principles of fundamental fairness. There is no justification for this undertaking. I am troubled by the apparent ease with which it has occurred.

For the reasons stated more fully in my dissent to the majority opinion (171 Ill. 2d at 546 (McMorrow, J., dissenting)), I must also voice my disagreement with the majority's ultimate conclusion on the merits. It is not contended that Dr. Desnick's telemarketing conversations were untruthful, misleading or unlawful. The majority has determined—again, without the benefit of any evidentiary record—that the simple act of phoning senior citizens and offering them a free eye examination is so " 'inherently conducive to overreaching and other forms of misconduct' " (171 Ill. 2d at 533, quoting

*Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 464, 56 L. Ed. 2d 444, 459, 98 S. Ct. 1912, 1923) that the State may prevent such phone calls before they have occurred. This conclusion is completely contrary to established Supreme Court precedent which has made clear that the State may act to prevent professional solicitation only where that solicitation poses a threat of imminent harm and where that harm is, for all practical purposes, unavoidable. Unquestionably, those conditions are not met with the phone calls which are alleged to have occurred here.

I believe this decision is deeply and irredeemably flawed. The decision results in the violation of Dr. Desnick's protective first amendment constitutional rights—rights which should be zealously guarded by the courts, not taken away without any evidence to justify so serious a deprivation. Accordingly, I dissent from the denial of the petition for rehearing.